CC-1998-1023                                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Elaine E. López Torres<br>    Peticionaria<br><br>    v.<br><br>Juan Alberto González Vázquez<br>    Recurrido | Certiorari<br><br>2000 TSPR 80 |
| --- | --- |

Número del Caso: CC-1998-1023

Fecha: 06/06/2000

Tribunal de Circuito de Apelaciones: Circuito Regional VII

Juez Ponente: Hon. Antonio J. Negroni Cintrón

Abogados de la Parte Peticionaria:

>               Bufete Rivera Colón, Rivera Torres & Rios Berly
>               Lcdo. Víctor M. Rivera Torres

Abogados de la Parte Recurrida:

>               Lcdo. Peter Ortiz
>               Lcdo. Mario A. Torres Rivera
>               Lcdo. Antonio Arraiza Miranda

Materia: Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Elaine E. López Torres

   Demandante-Peticionaria

       v.                        CC-98-1023       Certiorari

Juan A. González Vázquez

   Demandado- Recurrido

SENTENCIA

San Juan, Puerto Rico a 6 de junio de 2000.

I

El 8 de abril de 1994 Juan González Vázquez y Elaine López Torres, domiciliados y residentes de Puerto Rico, contrajeron matrimonio en Estados Unidos en el estado de Maryland. El mismo día de la celebración del matrimonio las partes suscribieron un contrato de capitulaciones matrimoniales ante un notario de esa localidad. El documento había sido redactado en Puerto Rico por el abogado de González Vázquez, quien envió el documento a Maryland.

El 18 de octubre de 1994 López Torres presentó demanda de divorcio ante el Tribunal de Primera Instancia en la que cuestionó la validez de las capitulaciones matrimoniales, por no haber sido elevadas a escritura pública.  Adujo, en la alternativa, que las capitulaciones eran inválidas en vista de que faltaba el consentimiento, pues, alegadamente, no tenía el conocimiento adecuado del alcance y significado del documento.

Luego de varios incidentes procesales, el Tribunal de Primera Instancia, emitió una resolución en virtud de la cual decretó la nulidad de las capitulaciones matrimoniales de referencia y dispuso que el matrimonio de las partes habría de regirse por el régimen de la sociedad legal de gananciales.

Inconforme, González Vázquez, apeló al Tribunal de Circuito de Apelaciones, el cual revocó la resolución dictada por el Tribunal de Primera Instancia.  Resolvió que las capitulaciones matrimoniales eran válidas ya que las mismas no tenían que ser otorgadas en escritura pública porque las partes, a tenor con las disposiciones del Artículo 11 del Código Civil, podían capitular bajo las disposiciones legales del estado de Maryland, las cuales no exigen un requisito de forma en particular para la validez de las capitulaciones matrimoniales.

A solicitud de López Torres, revisamos.


                                    II

En vista al criterio mayoritario pluralista –aunque por fundamentos distintos–, se revoca la Sentencia del Tribunal de Circuito de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para la continuación de los procedimientos.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Hernández Denton emitió Opinión Concurrente a la cual se une el Juez Presidente señor Andréu García y la Juez Asociada señora Naveira de Rodón.  El Juez Asociado

señor Fuster Berlingeri emitió Opinión Concurrente.  El Juez Asociado señor Negrón García emitió Opinión Disidente a la cual se unen los Jueces Asociados señores Rebollo López y Corrada del Río.


                    Isabel Llompart Zeno
                 Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Elaine E. López Torres

Demandante y Peticionaria

      v.                       CC-98-1023      Certiorari

Juan Alberto González
Vázquez

Demandado y Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Hernández Denton, a la cual se unen el Juez Presidente señor Andréu García y la Juez Asociada señora Naveira de Rodón

San Juan, Puerto Rico, a 6 de junio de 2000.

**Por entender que las capitulaciones matrimoniales otorgadas en Maryland por Juan Alberto González Vázquez y Elaine López Torres son inválidas, concurrimos de la Sentencia emitida por este Tribunal.**

**I**

**La controversia medular en el presente caso es si, a tenor con las disposiciones del Código Civil, es válido en Puerto Rico un contrato de capitulaciones matrimoniales otorgado por dos personas domiciliadas en Puerto Rico en un documento privado en los Estados Unidos, cuyas leyes no requieren que éstas se otorguen en**

**escritura pública. Por los fundamentos que expondremos a continuación, resolvemos en le negativa.**

**II**

El 8 de abril de 1994 Juan Alberto González Vázquez y Elaine López Torres, domiciliados y residentes de Puerto Rico, contrajeron matrimonio en Estados Unidos en el estado de Maryland. El mismo día de la celebración del matrimonio las partes suscribieron un documento titulado "Capitulaciones Matrimoniales", mediante el cual se estableció un régimen económico de separación de bienes y se excluyó expresamente la sociedad legal de gananciales.

El referido documento fue preparado y redactado en Puerto Rico en el idioma español por el abogado de González Vázquez, quien lo remitió a Maryland. Dicho documento, que no fue elevado a escritura pública antes de la celebración del matrimonio, fue firmado por las partes en presencia de una notario en la ciudad de Baltimore en Maryland. La participación de la notario se limitó a acreditar que las partes habían firmado el documento en cuestión.[1] La notario no sabía español, por lo que no leyó el documento, y no hizo advertencia alguna a las partes.

El 18 de octubre de 1994 López Torres presentó demanda de divorcio ante el Tribunal de Primera Instancia. La demandante, entre otras cosas, impugnó las capitulaciones matrimoniales. Adujo que las capitulaciones eran nulas porque no se habían elevado a escritura pública y porque, en la alternativa, el consentimiento prestado por ella estuvo viciado por no tener el conocimiento adecuado del alcance y significado de las cláusulas contenidas en el documento.

Por su parte, González Vázquez instó una reconvención en la cual adujo que, del tribunal decretar en su día la invalidez del contrato de

---

[1] La peticionaria, López Torres, argumenta que la comisión de la notario estaba vencida al momento de las partes firmar el documento. En vista del curso de acción que proponemos en el presente caso, resulta innecesario atender dicho planteamiento.

capitulaciones matrimoniales, tendría derecho a reclamar compensación por daños por López Torres haber repudiado un contrato acordado libre y voluntariamente. El Tribunal de Primera Instancia no permitió la presentación de la reconvención.

El foro de instancia, luego de examinar la prueba documental y las estipulaciones sometidas por las partes, emitió una resolución en la que decretó la nulidad de las capitulaciones matrimoniales de referencia y dispuso que el matrimonio entre las partes habría de regirse por el régimen legal de gananciales.

González Vázquez, luego de varios incidentes procesales, acudió al Tribunal de Circuito de Apelaciones, el cual revocó la resolución dictada por el foro de instancia. El Tribunal resolvió que las capitulaciones eran válidas ya que las mismas no tenían que ser otorgadas en escritura pública porque las partes, a tenor con el Artículo 11 del Código Civil, podían capitular bajo las formalidades exigidas por las leyes del estado de Maryland, las cuales no contemplan la escritura pública. Revocó, además, la resolución del Tribunal de Primera Instancia en virtud de la cual no se le permitió a González Vázquez presentar una reconvención.

Inconforme con el dictamen del Tribunal de Circuito de Apelaciones, López Torres acude ante nos.


III

Las capitulaciones matrimoniales son convenios en los que los otorgantes estipulan el régimen económico matrimonial o adoptan cualquier otra disposición por razón misma del matrimonio. Tomo IV, Puig Brutau, *Fundamentos de Derecho Civil*, 113,1985.

Nuestro ordenamiento permite otorgar capitulaciones matrimoniales antes de que una pareja proceda a contraer matrimonio. En este contrato sobre bienes en ocasión del matrimonio se pueden estipular las condiciones de la sociedad conyugal sobre los bienes presentes y

futuros, sin otras limitaciones que las señaladas por la ley. Artículo 1267 del Código Civil, 31 L.P.R.A. sec. 3551.

En Puerto Rico, contrario a las nuevas tendencias en las jurisdicciones civilistas, rige la doctrina de la inmutabilidad de las capitulaciones matrimoniales. Cualquier alteración que se haga en las capitulaciones matrimoniales ha de tener lugar antes de celebrarse el matrimonio y con la asistencia y concurso de las personas que intervinieron como otorgantes. Se prohibe expresamente que se modifiquen las capitulaciones luego de celebrado el matrimonio. Artículo 1271 y 1272 del Código Civil, 31 L.P.R.A. secs. 3555 y 3556. *Cruz Ayala v. Rivera*, resuelto el 11 de junio de 1996, 141 D.P.R.__ (1996); *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995); *Umpierre v. Torres Díaz*, 114 D.P.R. 449 (1983).

Aún cuando las capitulaciones matrimoniales constituyen un contrato sujeto al régimen de libertad de pacto reconocido en el Código Civil, en estos contratos la autonomía de la voluntad no es absoluta. *Ab Intestato de Víctor Manuel Saldaña*, 126 D.P.R. 640 (1990); *Umpierre v. Torres Díaz*, *supra*. En los contratos de capitulaciones matrimoniales no se puede pactar nada que sea contrario a las leyes o a las buenas costumbres, ni depresivo de la autoridad que respectivamente corresponde en familia a los futuros cónyuges. Artículo 1268 del Código Civil, 31 L.P.R.A. sec. 3552; *Domínguez Maldonado v. E.L.A.*, *supra*; *Umpierre v. Torres Díaz*, *supra*.

Por otra parte, hemos resuelto que a tono con la libertad de pacto provista por el Código Civil, en el contrato de capitulaciones matrimoniales una pareja puede optar por: (1) separación de bienes pero con participación en las ganancias; (2) sociedad de gananciales para lo cual basta con guardar silencio y no estipular nada o estipularlo expresamente; (3) renunciar al régimen legal de gananciales; (4) total separación de bienes; o (5) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las

buenas costumbres. *Cruz Ayala v. Rivera*, *supra; Domínguez Maldonado v. E.L.A., supra.*

Finalmente, hemos indicado que cuando una pareja otorga un contrato sobre bienes en ocasión del matrimonio y expresamente pacta que no se desea crear un régimen ganancial, el hecho de que posterior al matrimonio lleven a cabo actos de administración y esfuerzo común no da vida a una sociedad de bienes gananciales. *Domínguez Maldonado, supra.* Por el contrario, puede regir el régimen de gananciales cuando en el contrato no se pacta el régimen económico que los interesados desean y, además, se prueba que la pareja usó y administró los bienes como si su matrimonio estuviere regido por una sociedad de gananciales en la que ambos aportaban esfuerzo y trabajo personal. *Umpierre v. Torres Díaz, supra.*

Una vez esbozados nuestros pronunciamientos acerca de la figura de capitulaciones matrimoniales, nos corresponde  analizar cuál es la forma que nuestro ordenamiento requiere para la validez de las mismas.

IV

En nuestro ordenamiento jurídico, respecto a los contratos, rige el principio de libertad de forma.  Este principio se recoge en el Artículo 1230 del Código Civil, 31 L.P.R.A. sec. 3451, el cual dispone que "los contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".

No obstante, el Artículo 1273 del Código Civil establece una de las excepciones a ese principio general.[2] Dicho artículo establece, en lo pertinente: "las capitulaciones matrimoniales y las modificaciones

---

[2] El principio de libertad de forma tiene menos valor práctico en el Derecho Sucesorio y en el Derecho de Familia.  Albaladejo, *supra* a la pág. 483.  En estas áreas del derecho, por razón de interés u orden público, se halla más generalizada la existencia de actos formales. José Luis de los Mozos, *La Forma del Negocio Jurídico*, 21 Anuario de Derecho Civil 766 (1968).

que se hagan en ellas habrán de constar por escritura pública, otorgada antes de la celebración del matrimonio". 31 L.P.R.A. sec. 3557.[3]

El citado precepto, al exigir la escritura pública para la validez de las capitulaciones, constituye uno de los pocos preceptos que dentro del Código Civil establece un requisito de forma *ad solemnitatem.* Tomo V, Vol. 1, Castán, *Derecho Civil Español, Común y Foral*, 309, 1983; Tomo 9, Manresa, *Comentarios al Código Civil Español*, 197-202, 1969.

En los negocios en los que se requiere una forma *ad solemnitatem,* la forma es un requisito que se exige- además de los elementos esenciales del negocio- para la existencia y validez del mismo. De Castro y Bravo, *El Negocio Jurídico* 278-279, 1967; José Luis de los Mozos, *La Forma del Negocio Jurídico*, 21 Anuario de Derecho Civil 761-763, (1968). Si falta la forma requerida el negocio será nulo o ineficaz. *Id*.

De manera que, las capitulaciones matrimoniales que no consten en escritura pública no tendrán validez alguna. La doctrina española está conteste en el principio de que las capitulaciones matrimoniales son inexistentes si falta la forma que exige con carácter de solemnidad esencial el Artículo 1273 del Código Civil. Manresa, *supra* a la pág. 200; Puig Brutau, *supra* a la pág. 121; Castán, *supra* a la pág. 309. Como bien señala Manresa, citando a Fiore y Laurent, el requisito de escritura pública no se trata de un medio de prueba, de una forma, sino de una condición de existencia. **La formalidad es condición, más que de su validez, de su misma existencia**. Manresa, *supra* a las págs. 200-201.

Así pues, unas capitulaciones matrimoniales consignadas en un documento privado no tienen eficacia alguna ni entre las partes ni con

---

[3] Dicho artículo reconoce una excepción a la regla general si los bienes aportados por los cónyuges no son inmuebles, su valor no excede de quinientos (500) dólares y en el pueblo de residencia de los cónyuges no hubiera notario. En dichos casos las capitulaciones se podrán otorgar ante el secretario de ayuntamiento y dos testigos. Artículo 1276 del Código Civil, 31 L.P.R.A. sec. 3560. Es clara la patente inaplicabilidad de dicha excepción a la mayoría de los supuestos en que se otorgan capitulaciones matrimoniales.

relación a terceros.   Los derechos y obligaciones consignadas en las mismas no pueden ejercitarse, no existen, mientras la escritura no se otorgue antes de la celebración del matrimonio.  Manresa, *supra*, a la pág. 202.

Estos principios fueron recogidos desde muy temprano por la jurisprudencia española.  La sentencia del 10 de junio de 1912 del Tribunal Supremo Español establece que "las capitulaciones matrimoniales revisten tal importancia que para que sean válidas es inexcusable, como excepción al principio general del Artículo 1278 del Código Civil (Artículo 1230 del Código Civil de Puerto Rico) el otorgamiento de escritura pública, única forma especial requerida por el Art. 1321(Artículo 1273), en relación con el 1280 (Artículo 1232) en su número 3, establecida como garantía de otros derechos afectos a terceras personas, no menos sagrados y trascendentales en la vida privada, social y jurídica".   Se señaló, además, que "las capitulaciones matrimoniales, además de reunir los requisitos que son necesarios para la validez de los contratos en general, requieren la exigencia del otorgamiento de escritura pública".

V

Ha quedado claramente establecido que para que unas capitulaciones matrimoniales sean válidas en Puerto Rico las mismas tienen que constar en escritura pública.   Ahora bien, ¿es válido en Puerto Rico un contrato de capitulaciones matrimoniales que se otorgó en un documento privado en un país cuyas leyes no requieren una forma en particular para la validez de dicho contrato?

Para atender adecuadamente esta interrogante, resulta pertinente analizar las disposiciones del Artículo 11 del Código Civil, el cual dispone que al otorgar un contrato en el extranjero las partes pueden seguir las formalidades del país en el que se otorgue el mismo.

El Artículo 11 del Código Civil de Puerto Rico recoge la doctrina de Derecho Internacional Privado conocida como *locus regit actum* o *lex*

*loci actus*. Dicho artículo establece las normas referentes a la ley aplicable en cuanto a las formas y solemnidades necesarias para perfeccionar el otorgamiento en el extranjero de un contrato, testamento o cualquier otro documento público. El referido Artículo establece:

> Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.
> Cuando los actos referidos sean autorizados por funcionarios diplomáticos de los Estados Unidos en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.
> No obstante lo dispuesto en esta sección y en la anterior, las leyes prohibitivas concernientes a las personas, sus actos o bienes, y las que tienen por objeto las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros. 31 L.P.R.A. sec. 11.

En *Vda. de Ruiz v. Registrador*, 93 D.P.R. 914 (1967), resolvimos que las disposiciones del Artículo 11 son de naturaleza potestativa o discrecional, no imperativa o mandatoria. Es decir, los otorgantes pueden seleccionar el cumplimiento de las formas requeridas por el lugar del otorgamiento o por las requeridas por las leyes de Puerto Rico.

El fundamento de las reglas anteriormente mencionadas más bien responde a razones de índole práctica. La regla *locus regit actum* nació porque la necesidad la impuso, y se ha difundido porque su aplicación facilita la realización de ciertos actos jurídicos. José de Yanguas Mejías, *Derecho Internacional Privado*, 340 (1971). Le brinda a las partes la posibilidad de acogerse a la forma establecida en una ley que está a su alcance inmediato.

No obstante las disposiciones del Artículo 11 del Código Civil, existen varios argumentos esgrimidos por la doctrina para fundamentar la exigencia de escritura pública en las capitulaciones matrimoniales(independientemente de donde éstas se otorguen), los cuales nos impiden validar en Puerto Rico unas capitulaciones consignadas en un documento privado. De entrada, es preciso reiterar lo antes dicho a los efectos de que el exigir que las capitulaciones

matrimoniales consten en escritura pública no es un mero requisito de forma, sino una condición para la existencia de las capitulaciones matrimoniales. Además, un análisis de (a) la naturaleza; (b) el contenido y (c) las características de las capitulaciones matrimoniales nos obliga a no desviarnos de esta norma cuando las capitulaciones se otorgan en el extranjero. Veamos.

(a)

Respecto a la naturaleza de las capitulaciones matrimoniales, valga decir que éstas revisten gran interés público, entre otras razones, porque en nuestro ordenamiento jurídico éstas no constituyen el régimen ordinario para atender los aspectos económicos de la unión entre los cónyuges. El régimen legal de gananciales es el que por disposición expresa de ley rige el destino y distribución de bienes de los cónyuges.[4] La deseabilidad de este sistema económico primario matrimonial se trasluce del extenso y detallado articulado de nuestro Código Civil que delinea los perfiles de dicha figura jurídica.

Las capitulaciones matrimoniales revisten una gran complejidad y singularidad que le otorgan enorme interés desde el punto de vista jurídico y social. Como señala Castán, citando a Bonet, la capitulación:

> "Es un acto esencialmente complejo, y de gran amplitud, ya en cuanto al tiempo en que hacen sentir su acción no sólo durante el matrimonio, sino a su disolución; ya en cuanto al espacio, pues además de los esposos quedar ligados por la carta matrimonial también los terceros, ya en cuanto a su objeto, capaz de comprender negocios jurídicos que no tengan relación directa con el matrimonio futuro. Constituyen pues, una especie de "acto reglamentario", cuya finalidad es la de instituir un estatuto, más bien que la de crear relaciones entre las partes, como los contratos ordinarios." Castán, *supra* a la pág. 298.

(b)

El contenido de las disposiciones que pueden incluirse en un contrato de capitulaciones matrimoniales también justifica la exigencia

---

[4] El Artículo 1267 del Código Civil, 31 L.P.R.A. sec. 3551, establece que a falta de contrato sobre los bienes, se entenderá el matrimonio contraído bajo el régimen legal de gananciales.

de escritura pública para su constitución. Esto es así por la importancia que puede tener el contenido de este tipo de contrato tanto para la futura relación matrimonial, como para terceros. Como este Tribunal ha señalado, mediante el contrato de capitulaciones matrimoniales se pueden regular los derechos de los esposos sobre sus bienes respectivos; los derechos sobre las ganancias realizadas por ellos durante el matrimonio; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otros de los esposos; y, en definitiva, el interés económico y social de la relación del matrimonio. *Domínguez Maldonado v. E.L.A, supra.* Las capitulaciones también pueden contener acuerdos relativos a la gestión por cada esposo de sus bienes propios, y a la intervención en los del otro, y establecer donaciones por razón del matrimonio. *Id.*

De manera que, aunque el propósito fundamental de realizar un pacto de capitulaciones matrimoniales es establecer el régimen económico que ha de imperar en el matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal. *Id.*

Como bien señala Manresa:

> ¿Por qué exige la ley la escritura pública en las capitulaciones? Preciso es confesar que si algún contrato merecía esta exigencia, ninguno más indicado que el que nos ocupa. Son las capitulaciones matrimoniales, como se ha dicho con razón, un verdadero pacto entre dos familias: más que un contrato, un régimen. Median en ellas donaciones, se constituye una sociedad, se hacen estipulaciones diversas, que interesan no a sólo a los futuros esposos, sino también a sus padres, y a sus hijos y a los terceros. Su importancia es excepcional. Manresa, *supra* a la pág. 197.

La exigencia de forma se explica por la importancia que revisten las capitulaciones matrimoniales, y por la fuerza constituyente que a través de las mismas, alcanzan tanto las aportaciones de bienes efectuadas tanto por los cónyuges como por los terceros, lo mismo por lo que se refiere a la trascendencia de los pactos en el ámbito sucesoral y por las reglas que determinan el régimen económico del matrimonio. Esto sin olvidar los otros negocios que pueden constituirse en el instrumento relacionados directa o indirectamente con las

relaciones patrimoniales que se dan en el matrimonio.    Tomo 18, Vol.

1, Albaladejo, *Comentarios al Código Civil y Compilaciones Forales,*

198-199,1982.

(c)

Con relación a las características sustantivas básicas de las

capitulaciones en Puerto Rico, es decir que se otorguen antes de la

celebración del matrimonio y que no se alteren después de celebrado el

mismo, vale decir que únicamente se pueden satisfacer con las garantías

que ofrece una escritura pública.

Es esencial que la fecha de las capitulaciones sea cierta e

indubitada.   Esto es así porque este contrato ha de celebrarse con

anterioridad al matrimonio.   De lo contrario, el contrato será

inválido.   La escritura pública es el único documento en el que se da

fe de la fecha cierta del otorgamiento de un contrato.   El documento

privado carece de garantía de fecha cierta y de la legalidad de las

provisiones allí contenidas.

Por otro lado, **a diferencia de otros contratos**, el contrato de

capitulaciones es inmutable y una vez otorgado y celebrado el

matrimonio el mismo no puede ser alterado, o modificado y sus términos

son vinculantes para las partes.[5]   Cualquier alteración que se haga en

las capitulaciones matrimoniales tiene que tener lugar antes de

celebrado el matrimonio.   Artículos 1271 y 1272 del Código Civil, 31

L.P.R.A. sec. 3555 y 3556.   Un documento privado puede ser fácilmente

destruido, alterado, o modificado lo que implicaría una alteración al

régimen económico matrimonial, lo que va en abierta contravención al

principio de inmutabilidad de las capitulaciones consagrado en nuestro

Código Civil.   Nótese que en el caso de escrituras públicas las mismas

---

[5]  En *Vilariño Martínez v. Registrador*, 88 D.P.R. 288, 293 (1963), explicamos que las razones para exigir que el contrato de capitulaciones se otorgue antes de la celebración del matrimonio son: "que los interesados están en condiciones de prestar libremente su consentimiento para tal otorgamiento, y que los terceros pueden conocer el régimen adoptado y las estipulaciones convenidas partiendo de una época fija, después de la cual no puede haber alteración". (Énfasis Suplido).

forman parte del protocolo del notario que ha de ser conservado por éste, por lo que en cualquier tiempo puede consultarse por las partes interesadas.[6]

Manresa sintetiza muy acertadamente estos principios:

La fecha de las capitulaciones debe ser indubitada por los efectos que produce, lo consignado ha de ser claro, seguro, irrefutable. ¿Bastaría contentarse con simples documentos privados? Evidentemente, no. Sería preciso exigir que se diese autenticidad a su fecha con arreglo al artículo 1227 (Artículo 1181 del Código Civil de Puerto Rico); que se depositase el contrato en el oficio de un notario, por ejemplo, para que en cualquier tiempo pudiera consultarse, y no sufriere extravío ni fuese posible su alteración o suplantación; que no quedase abandonada su redacción y alcance a la ignorancia o impericia de las partes o de un cualquiera, tratándose de materias tan difíciles, complicadas y trascendentales como las que son objetos de estos contratos. ¿Cómo puede conseguirse todo esto? Sólo había un medio práctico y seguro, que era la escritura pública que da autenticidad completa a la fecha y a las estipulaciones de las partes, y ofrece seguridad de la conservación y la garantía de acierto, legalidad y previsión que les presta la intervención del Notario. Manresa, *supra* a las págs. 197-198.

Así, en vista de la naturaleza, del contenido y de las características tan particulares del contrato de capitulaciones, éstas sólo deben pactarse con plena conciencia de las consecuencias que ello acarrea, porque una vez pactadas, y celebrado el matrimonio, sus términos son vinculantes y no pueden variarse. Esa plena conciencia sólo la puede dar un notario que tenga la obligación ineludible de asesorar legalmente a los otorgantes, como lo es el notario de tipo latino reconocido en nuestra jurisdicción.

Es importante enfatizar que tanto la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2001 *et seq*, y su Reglamento, así como su jurisprudencia interpretativa, reconocen plenamente los presupuestos del notariado latino. Existe una marcada distinción entre el notario de tipo latino y otro tipo de notario.

---

[6] Evidencia de la rigurosidad de este principio es el Artículo 1274 del Código Civil, 31 L.P.R.A. sec. 3558, el cual exige expresamente, so pena de nulidad, que las alteraciones que se hagan a las capitulaciones, obviamente antes de la celebración del matrimonio, deberán constar en el protocolo del notario por nota marginal y que éste las haga constar en las copias que expida, bajo pena de inmunización de daños si no lo hiciere.

En el notario de tipo latino se funden dos facetas esenciales: el notario en su función como profesional o técnico del derecho y el notario en su carácter de funcionario público. El notario puertorriqueño no es abogado de ninguno de los otorgantes, no representa a ningún cliente, representa a la fe pública, representa la ley para todas las partes. Además de ser asesor y consejero legal, el notario puertorriqueño es el instrumentador de los documentos que conllevan los actos y negocios jurídicos a los cuales les da seguridad y certeza con su pericia profesional y bajo el manto de la fe pública de la cual es depositario. *Exposición de Motivos de la Ley Notarial de Puerto Rico*. Véase, *In re Colón*, 131 D.P.R. 121 (1992).

En su función de custodio de la fe pública notarial, el Notario le imparte veracidad, autenticidad, y legalidad a los instrumentos públicos y notariales que autoriza. Al autorizar un documento el notario da fe pública y asegura que ese documento cumpla con todas las formalidades de ley, formal y sustantivamente, que el documento es legal y verdadero, y que se trata de una transacción válida y legítima. *In re Feliciano Ruiz*, 117 D.P.R. 269 (1986).

El notario del "Common Law", por el contrario, no es un jurista o abogado y su función se limita al reconocimiento y autenticación de firmas. Este tipo de notario es el que existe en Estados Unidos. Como ya hemos visto, la función del notario de tipo latino trasciende el acto de mera legalización de firmas. *In re Feliciano*, *supra*. El notario puertorriqueño no es un simple observador del negocio jurídico que ante él se realiza, limitando su actuación a cerciorarse de la identidad de las partes y autenticidad de las firmas. *Id*. Su función, no es privada, sino pública. Trasciende la de un autómata de firmas y penetra el campo de la legalidad de la transacción que ante él se concreta. *Id*.

VI

A luz de todo lo anterior, concluimos que en el caso tan particular de las capitulaciones matrimoniales, no podemos darle prominencia a una disposición preliminar del Código Civil, cuyo fundamento responde a razones de índole práctica, sobre un articulado específico del Código Civil y unos principios fundamentales de nuestro ordenamiento jurídico.

Así pues, consideramos que para que las capitulaciones matrimoniales sean válidas en Puerto Rico las mismas deben constar en escritura pública, independientemente del lugar en el que se otorguen. Por la naturaleza y características particulares de las capitulaciones matrimoniales y por la trascendencia e impacto que tienen las mismas, resulta imperativo brindarle una certeza y garantía las cuales sólo se obtienen con la escritura pública y la intervención de un notario de tipo latino.

De manera que, entendemos, que a tenor con nuestra posición, aquellos domiciliados de Puerto Rico que interesen capitular deben hacerlo en un país en el cual exista un documento similar a la escritura pública y en el cual el notario tenga una función análoga al notario en Puerto Rico.

Si las partes interesan otorgar un contrato de capitulaciones en un país que no cumple con dicho requerimiento, nada impide que, mediante un poder otorgado en dicho país, los contrayentes autoricen a una persona a que comparezca ante un notario en Puerto Rico para que éste autorice la correspondiente escritura pública. Las partes comparecerían como representantes de los contrayentes. Esto es posible a través de la figura del mandato. Véase Artículos 1600-161 del Código Civil, 31 L.P.R.A. sec. 4421-4429. En dicho caso las partes tendrán que asegurarse de cumplir con las disposiciones de La Ley Notarial y las leyes referentes a la protocolización de los poderes otorgados en el extranjero. Véase 4 L.P.R.A. *et seq*; 4 L.P.R.A. secs. 921-927.

Por otro lado, la protocolización de las capitulaciones otorgadas en el extranjero en un documento privado no es suficiente. La

protocolización de un documento significa meramente la transcripción de un documento y su ingreso en el protocolo de instrumentos públicos del notario, incorporando o uniendo dicho documento original como parte de la escritura o acta que viabiliza este procedimiento. *In re Protocolización de Poder*, 110 D.P.R. 652 (1981).

Como bien señala Pedro Avila Álvarez en su obra *Derecho Notarial*, "El acto de protocolizar se refiere a un hecho de inscripción que por medio de un acto notarial autoriza a requerimiento ya de cualquiera de las partes, ya de otra persona que entregue el documento al notario porque lo que interesa es la entrega y subsiguiente protocolización y no quien haya verificado aquella... **Con la protocolización no se da forma pública al negocio porque ni este se recoge en el documento notarial ni el que lo contiene deja de ser privado.**" (Énfasis Suplido). Pedro Avila Álvarez, *Derecho Notarial*, 1986, págs. 108-110.

Así pues, la manera de elevar a documento público un documento privado no es protocolizar el documento, sino otorgar una **escritura** que recoja el negocio y se ratifique ante el notario el consentimiento prestado privadamente. *Id.*

VII

Finalmente, resulta pertinente señalar que nuestra postura es cónsona con la corriente que se ha seguido en España tras la reforma del Título Preliminar del Código Civil en 1974. La nueva redacción del Artículo 11 del Código Civil Español, Artículo 11 del nuestro, recoge la norma que exponemos hoy en el presente caso. Así pues, en España los ciudadanos españoles que quieran capitular en el extranjero vienen obligados a otorgar las capitulaciones en escritura pública. A esos fines el referido artículo del Código Civil Español dispone en lo pertinente que:

> ...Si la ley reguladora del contenido de los actos y contratos exigiere para su validez una determinada forma o solemnidad, será siempre aplicada, incluso en el caso de otorgarse aquéllos en el extranjero.

En lo referente a las capitulaciones matrimoniales, este artículo ha sido interpretado por la doctrina a los efectos de que siempre que resulte aplicable el derecho español al contenido de las capitulaciones, el requisito de que éstas consten en escritura pública siempre ha de respetarse, incluso cuando las mismas se otorguen en países extranjeros. *Comentarios a la Reforma del Código Civil*, Editorial Tecnos, Madrid, 1977, págs. 578-581; Tomo I, Vol. II, Albaladejo, *Comentarios al Código Civil y Compilaciones Forales*, 191, 1995. De manera que, a tenor con esta línea doctrinal, se establece un régimen único tanto para el fondo como para la forma de las capitulaciones matrimoniales. *Id.*

VIII

En el presente caso las partes otorgaron un contrato de "capitulaciones matrimoniales" en Estados Unidos en el estado de Maryland. Las partes firmaron el documento privado en presencia de una notario, cuya intervención se limitó a acreditar que las partes firmaron el documento en cuestión. El documento privado no fue elevado a escritura pública antes de la celebración del matrimonio.

Resulta pertinente aclarar que en este caso no está en controversia que el **contenido** de las capitulaciones matrimoniales se rige por las leyes de Puerto Rico. Tal conclusión no ha sido cuestionada por las partes y encuentra apoyo en el Artículo 9 del Código Civil. El referido artículo, comúnmente llamado el estatuto personal, establece que "las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros. Sobre la aplicabilidad del Artículo 9 al contenido de las capitulaciones matrimoniales, véase Tomo I, Vol. II, Albaladejo, *Comentarios al Código Civil y Compilaciones Forales*, 1995, págs.190-194. En Puerto Rico el domicilio de un ciudadano determina la aplicación del estatuto personal. *Martínez v. Vda. De Martínez*, 88

D.P.R. 443 (1963); *León Rosario v. Torres*, 109 D.P.R. 808 (1980). Ambas partes admitieron estar domiciliadas en Puerto Rico al momento de otorgarse las capitulaciones.

Respecto a la **forma**, concluimos que el contrato de capitulaciones matrimoniales suscrito por López Torres y González Vázquez en Maryland es inválido.  El mismo no fue elevado a escritura pública antes de la celebración del matrimonio.  Además, la intervención del notario en el presente caso se limitó a acreditar que las partes habían firmado el documento en su presencia.  La notario ni siquiera leyó el documento ni le hizo advertencia alguna a las partes.

Por los fundamentos que preceden, concurrimos con la Sentencia emitida por este Tribunal.


Federico Hernández Denton
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO**Error! Bookmark not defined.**


Elaine E. López Torres

    Demandante-Peticionaria

       vs.                                        CC-1998-1023      Certiorari

Juan Alberto González Vázquez

    Demandado-Recurrido


Opinión Concurrente emitida por el Juez Asociado señor FUSTER BERLINGERI.


San Juan, Puerto Rico, a 6 de junio de 2000.


Nos encontramos en el caso de autos con una de las situaciones en las que aplica el Artículo 7 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 7. Se trata de una laguna jurídica con respecto a la controversia específica ante nos, que este Tribunal debe resolver conforme a equidad, según lo dispone el referido Artículo 7. Olmo v. Young & Rubican of P.R., 110 D.P.R. 740 (1981); Collazo Cartagena v. Hernández Colón, 103 D.P.R. 870 (1975).

La cuestión que nos concierne aquí no puede resolverse solamente mediante un análisis de los principios generales de derecho positivo que son pertinentes. Las dos otras opiniones emitidas por miembros de este Foro en el caso de autos conducen a

resultados contradictorios a pesar de que ambas están fundamentadas en estudios respetables de derecho positivo. En situaciones como estas, es particularmente menester adaptar los principios generales de derecho a las realidades prácticas de la vida social. Siguiendo el paradigma prevaleciente en nuestro particular universo jurídico[7], debemos identificar y jerarquizar los intereses sociales que merecen ser protegidos, para dictaminar entonces las pautas que correspondan en consideración a éstos.

I

Desde la perspectiva aludida en el párrafo anterior, no debe adoptarse aquí una norma que preceptúe inflexiblemente que las capitulaciones matrimoniales suscritas fuera de Puerto Rico por personas domiciliadas en Puerto Rico no son válidas en nuestro país si no constaban en escrituras públicas. Tal norma impondría una grave carga a las personas domiciliadas en Puerto Rico que tienen residencia actualmente en Estados Unidos —o que opten por residir allí en el futuro. Podemos tomar conocimiento judicial de que miles de puertorriqueños se han trasladado a Estados Unidos por razones de estudio o trabajo, pero con el ánimo claro de regresar a la isla en algún momento oportuno. Miles más como ellos continuarán haciéndolo en el futuro previsible. Como se trata de personas cuyo domicilio es Puerto Rico aunque residan fuera de la isla,[8] unos y otros quedarían seriamente

---

[7] Me refiero a concepciones fundamentales como las de Roscoe Pound, que preconizan que el Derecho existe para lograr la mejor consecución posible de los intereses sociales. Véase, Social Control Through Law, Yale Univ. Press., 1943.

[8] Véase, P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199 (1981); Prawl v. Lafita Delfín, 100 D.P.R. 35 (1971); Martínez v. Vda. de Martínez, 88 D.P.R. 443 (1963).

afectados si se han casado o desean casarse fuera de Puerto Rico al amparo del régimen de separación de bienes establecido mediante contrato privado, de imponerse una norma que inflexiblemente le requiera a los **domiciliados** en Puerto Rico formalizar sus capitulaciones mediante escrituras públicas. Es decir, los que ya se hayan casado mientras sólo residían fuera de la isla y hayan otorgado capitulaciones sin escritura pública, al regresar a Puerto Rico se encontrarían con la triste y grave realidad de que el acuerdo prenupcial que ha estado rigiendo sus relaciones económicas no es válido, con todo lo que ello implica con respecto a la desestabilización del régimen patrimonial que tenían contraído. Quedarían en entredicho múltiples transacciones que hayan realizado entre sí y con respecto a terceros al amparo del contrato privado de capitulaciones. Además, si desean continuar con el régimen de bienes que habían establecido, al regresar a su domicilio tendrían que tomar la medida artificiosa de divorciarse para poder hacer unas nuevas capitulaciones en escritura pública, y entonces volver a casarse. La norma jurídica en cuestión se tornaría para ellos, no en un instrumento para facilitar su legítima voluntad marital, sino en una onerosa pesadilla.

Por otro lado, para aquellos domiciliados de Puerto Rico que residen fuera de la isla y que quieran casarse mientras están fuera de Puerto Rico, la norma en cuestión los obligaría a regresar a la isla antes del matrimonio para otorgar una escritura pública de capitulaciones. Tendrían que dedicar tiempo y dinero adicional para poder realizar su voluntad marital, lo que puede que no les sea posible si las condiciones de su estudio o trabajo se lo impiden. De nuevo, la norma en cuestión, que requiere que los domiciliados en Puerto Rico otorguen sus capitulaciones matrimoniales mediante escritura pública, contituiría una camisa de fuerza para impedir opciones legítimas a unos puertorriqueños que por razones meritorias no residen en el país. Cuando menos, éstos últimos tendrían que utilizar el mecanismo artificioso de otorgar unos poderes ante personas que no son notarios de tipo latino, para autorizar a otras

personas a comparecer ante un notario de Puerto Rico en representación de los contrayentes, para que éste autorice entonces una escritura pública de capitulaciones antes de que los interesados contraigan matrimonio, **sin poder hacerle a éstos las advertencias de rigor**.

Nótese que las adversas consecuencias de la norma en cuestión impactaría no sólo a las parejas como las de autos, que al divorciarse tienen que dilucidar qué bienes le corresponden a cada cual terminado el matrimonio. Lo que es mucho más importante, afectaría también a los que **quieren continuar casados**, a los que no desean divorciarse que tienen o tenían decidido regir su matrimonio al amparo de su acuerdo prenupcial.

Más aun, la norma referida tendría la irónica e incongruente consecuencia de que para personas **que no estaban domiciliadas en Puerto Rico** cuando otorgaron sus acuerdos prenupciales en documentos privados, pero que luego vienen a residir o se domicilian en la isla, sus capitulaciones sí son válidas en Puerto Rico. Ello daría lugar a la inequitativa situación de que algunos norteamericanos, de los muchos que se mudan a Puerto Rico y se establecen aquí de manera permanente, tengan acuerdos prenupciales que aunque no constan en escritura pública son válidos, mientras que unos puertorriqueños que han residido temporalmente en el exterior y regresan luego a su hogar en la isla se encuentren que los suyos no son legítimos porque no constan en escritura pública.

Finalmente, la norma en cuestión daría lugar a enrevesadas controversias sobre quién estaba domiciliado en Puerto Rico al acordar capitulaciones fuera de la isla y quién no lo estaba.

A la luz de todos los efectos adversos referidos y de las incongruencias y complicaciones mencionadas, no está justificado adoptar la norma, propuesta por algunos de mis compañeros en su opinión concurrente, que preceptua de modo inflexible que para que sean válidas las capitulaciones matrimoniales de personas **domiciliadas en Puerto Rico**, dichas capitulaciones tienen que haberse otorgado mediante escritura pública. Dicha norma no se justifica sobre todo con relación a los domiciliados que no residen en Puerto Rico y **que no desean divorciarse**,

por lo que no tienen disputa alguna sobre sus acuerdos prenupciales. Para esos puertorriqueños, al regresar a su hogar luego de haber convenido unas capitulaciones fuera de la isla antes de casarse, la norma propuesta invalidaría tales capitulaciones y sería una grave carga, claramente contraria a sus intereses legítimos. No parece justificado que para este grupo de personas los acuerdos prenupciales referidos advengan inválidos al regresar a Puerto Rico, mientras que ello no ocurriría para aquellos no domiciliados que se trasladen a Puerto Rico sin haber otorgado sus capitulaciones en escrituras públicas.

II

No obstante, nada de lo señalado antes niega el valor y la gran conveniencia que tiene el que las capitulaciones referidas se otorguen mediante escritura pública. No puede negarse que es mediante dicho documento que se logra la mayor certeza sobre la fecha y el contenido de las capitulaciones. Más importante aun, mediante el proceso de otorgar la escritura pública ante un notario de tipo latino se asegura que las partes entiendan cabalmente el significado y el alcance de lo que pactan. Mediante ese proceso las partes deben quedar claramente advertidas de las consecuencias que tiene la decisión de no optar por el régimen de bienes gananciales. El alto interés público que existe respecto a las certezas aludidas ciertamente justifica una norma que preceptúe que para aquellos domiciliados de Puerto Rico que **además residen en la isla al momento de contraer matrimonio**, las capitulaciones referidas deben otorgarse antes de casarse mediante escritura pública.

En resumen, pues, frente al imperioso reto que tenemos los Jueces de este Foro de buscar el balance más armonioso de aquellos intereses sociales en conflicto que reclaman nuestra protección, estimo que la norma que requiere el otorgamiento de las capitulaciones matrimoniales mediante escritura pública aplica sólo a los casos de personas que tienen tanto su **domicilio** como su **residencia** en Puerto Rico cuando se proponen contraer matrimonio.

Procede que aplique lo anterior a la situación del caso de autos.

III

De los documentos que obran en autos, incluyendo la sentencia del foro de instancia, surge claramente que tanto la peticionaria como el recurrido no sólo tenían su **domicilio** en Puerto Rico al momento de acordar las capitulaciones pactadas entre ellos sino que, además, eran **residentes** de la isla. De hecho, el proceso de otorgar dichas capitulaciones se inició en Puerto Rico, cuando el abogado del recurrido las formuló. Estas fueron firmadas por los contrayentes momentos antes de celebrar su matrimonio, que se llevó a cabo en Baltimore donde estos dos

puertorriqueños se encontraban de pasada. El hecho accidental y aislado de estar en la ciudad referida de manera muy provisional y temporera de ningún modo alteró la realidad de que ambos eran personas **domiciliadas y residentes de Puerto Rico**. La breve estadía en Baltimore del recurrido y la peticionaria no los convertía ni siquiera en residentes de ese lugar, como lo sería un domiciliado en Puerto Rico que estudie o trabaje allí aunque tenga la intención definitiva de regresar a su país natal oportunamente. La accidental presencia de la peticionaria y el recurrido en Baltimore era, según Puig Peña -Tratado de Derecho Civil, Tomo I, Vol. XI, Madrid (1958), pág. 193- sólo **"un simple paradero"**, que es distinto a tener residencia o domicilio en dicho lugar, y menos que ello.

Vistas en conjunto todas las circunstancias del caso de autos, pues, es menester concluir que el acto jurídico que aquí nos concierne se rige por la norma que nos parece correcta, de que las capitulaciones matrimoniales de personas que son a la vez domiciliados y residentes de Puerto Rico tienen que otorgarse en escritura pública para que sean válidas.

Concurro, por tanto, con los que por razones parecidas opinan que el pacto entre el recurrido y la peticionaria **no es válido**; y uno mi voto al de ellos para emitir una sentencia mayoritaria a tales efectos.

 

 

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Elaine E. López Torres

 Demandante-Peticionaria

|  |  |  |
|---|---|---|
| v. | CC-98-1023 | Certiorari |

Juan Alberto González

Vázquez

 Demandado-Recurrido

Opinión Disidente del Juez Asociado señor Negrón García a la cual se unen los Jueces Asociados señores Rebollo López y Corrada del Río

San Juan, Puerto Rico, a 6 de junio de 2000

Distinto a lo resuelto en la sentencia emitida por una pluralidad del Tribunal, a la luz del derecho y la doctrina

moderna, el contrato de capitulaciones matrimoniales otorgado en Maryland por la Sra. Elaine E. López Torres y el Sr. Juan Alberto González Vázquez, previo a su enlace, **es válido en Puerto Rico.**

I

En su proyección de stare decisis la controversia novel específica consiste en resolver si un contrato de capitulaciones matrimoniales suscrito por domiciliados puertorriqueños en documento privado

-en una jurisdicción que permitía esa forma para dicho negocio jurídico-, tiene aquí eficacia. La cuestión atañe interpretar el Art. 11 del Código Civil, -denominado **estatuto formal**[9]-, a la luz del Art. 1273,[10] que exige el requisito de escritura pública para las capitulaciones matrimoniales. También el **estatuto personal**, Art. 9 del Código Civil,[11] que rige sobre "[l]os derechos y deberes de familia, o al estado, condición y capacidad legal" de los domiciliados en Puerto Rico.

No existe controversia sobre el contenido de las capitulaciones matrimoniales. Las disposiciones sustantivas del contrato de capitulaciones otorgado en Maryland se ajustan al derecho puertorriqueño. Es más, los otorgantes hicieron constar en las cláusulas mismas del contrato que el régimen matrimonial que allí establecían se regiría por el derecho puertorriqueño. Tampoco hay discrepancia en cuanto a que la forma de las capitulaciones no fue de escritura pública y que el documento nunca fue elevado a esa categoría ni protocolizado en Puerto Rico. No está en disputa el domicilio de ambos, ni que se divorciaron en Puerto Rico. **La única controversia inmediata ante nos recae sobre la validez del contrato, otorgado de acuerdo a las formas del estado de**

---

[9]"Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.

Cuando los actos referidos sean autorizados por funcionarios diplomáticos o consulares de los Estados Unidos en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.

No obstante lo dispuesto en esta sección y en la anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros." 31 L.P.R.A. sec. 11.

[10]"Las capitulaciones matrimoniales y las modificaciones que se hagan en ellas habrán de constar por escritura pública, otorgada antes de la celebración del matrimonio.

Se exceptúan de esta regla los bienes que se hallen en las condiciones a que se refiere la sec. 3560 de este título." 31 L.P.R.A. sec. 3557.

[11]"Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal a las personas, obligan a los

**Maryland, a la luz del Art. 11 de nuestro Código Civil. Dependiendo del resultado subsistiría dirimir en sus méritos la alegación de la demandante López Torres de que su consentimiento estuvo viciado.**

Antes de entrar de lleno en el análisis sobre la interacción de los preceptos mencionados, es menester aclarar ciertos términos y hacer ciertas distinciones en torno a los conceptos de **matrimonio** y de **régimen matrimonial**. El término **matrimonio** "tiene dos acepciones jurídicas: una se refiere al 'estado' o 'relación conyugal' (matrimonio in facto esse) y la otra, al 'acto' de celebración por el cual se establece ese estado (matrimonio in fieri)".[12] Ambas acepciones nos conciernen.

Por la primera, el matrimonio tiene una dimensión personal y otra patrimonial. Los cónyuges, por virtud de su vínculo, se deben mutuamente la cohabitación, la fidelidad, la protección y el mutuo auxilio,[13] siendo estos deberes
físicos y sentimentales los efectos personales del matrimonio.

Pero los cónyuges, también por su enlace, constituyen un régimen de bienes, de deberes y derechos patrimoniales, régimen éste, cualquiera que sea, el principal efecto patrimonial del matrimonio. Nuestro Código Civil establece que, en ausencia de pacto, el régimen económico matrimonial será la sociedad legal de gananciales.[14] Permite, sin embargo, la constitución de un régimen alterno mediante el previo otorgamiento de un contrato de capitulaciones matrimoniales.[15] Sobre dichas capitulaciones, hemos resuelto que los futuros cónyuges podrán "optar por: (1) la separación de bienes, pero con participación en las ganancias; (2) sociedad de gananciales para lo cual basta con guardar silencio y no

---

ciudadanos de Puerto Rico, aunque residan en países extranjeros." 31 L.P.R.A. sec. 9.

[12]R. Serrano Geyls, 1 Derecho de Familia de Puerto Rico, pág. 87 (1997).

[13]Art. 88, Código Civil, 31 L.P.R.A. sec. 281.

[14]Art. 1295, Código Civil, 31 L.P.R.A. sec. 3621.

[15]Art. 1267, Código Civil, 31 L.P.R.A. sec. 3551.

estipular nada o estipularlo expresamente, que tampoco está prohibido; (3) renunciar al régimen legal de gananciales; (4) total separación de bienes; (5) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres." Domínguez Maldonado v. E.L.A., 137 D.P.R. 954 (1995).

Toda esta vertiente afecta el contenido, el "fondo", del matrimonio. El matrimonio, sin embargo, es manifiestamente un acto jurídico contractual a la vez que institucional, revestido de un gran interés público. **Como contrato, tiene una dimensión dual sustantiva y formal**. Su dimensión **sustantiva** remite a los deberes entre los cónyuges, a los requisitos de capacidad y consentimiento de los contrayentes, a las prohibiciones estatuidas en cuanto al tipo de régimen que rige la sociedad conyugal, como es vedar capitulaciones que atenten contra las leyes, la moral y las buenas costumbres,[16] la prohibición de constituir una sociedad universal,[17] etc.

El matrimonio tiene también una dimensión **formal**, en cuanto a la ceremonia de celebración y las personas autorizadas para hacerlo, entre otras. Los domiciliados en Puerto Rico, no importa dónde contraigan matrimonio, deberán atenerse a las leyes puertorriqueñas que regulan el contenido de la institución, por razón del llamado "estatuto personal", consagrado en el citado Art. 9 de nuestro Código Civil.[18] No podría, por ejemplo, un domiciliado puertorriqueño ya casado acudir a un país donde se permita la poligamia

---

[16]Art. 1268, Código Civil, 31 L.P.R.A. sec. 3552.

[17]Art. 1568, Código Civil, 31 L.P.R.A. sec. 4323.

[18]Art. 9, Código Civil, 31 L.P.R.A. sec. 9.

No hay controversia sobre la aplicabilidad del estatuto personal al contenido del matrimonio, del régimen matrimonial o del contrato sobre bienes con ocasión del matrimonio (capitulaciones matrimoniales).

para contraer matrimonio con una segunda esposa. En cuanto a sus formalidades, sin embargo, tendría que cumplir con las solemnidades del lugar donde lo contrae para que sea válido.

Se pone así de manifiesto la segunda distinción que interesa resaltar: **la que distingue entre el fondo y la forma de un negocio jurídico**. A poco reflexionemos, el contrato de capitulaciones matrimoniales ofrece también esta dicotomía entre fondo y forma. Como todo contrato, responde a tres elementos fundamentales: consentimiento de las partes, causa y objeto. La causa de un contrato de capitulaciones matrimoniales es siempre el matrimonio mismo; a falta de matrimonio, el contrato carece de causa y es nulo.[19] Su objeto, de más está decir, es la relación patrimonial que establece entre los cónyuges, las donaciones que se hagan entre sí, así como aquellas otras disposiciones que allí consten.

Pero el contrato de capitulaciones matrimoniales es un contrato **formal** y **solemne**, lo que es decir, **primero**, que requiere una forma determinada para ser válido y, **segundo**, que ésta forma sea una escritura pública otorgada ante notario. Este requisito condiciona la misma existencia del negocio jurídico. Por tanto, en matrimonio contraído en Puerto Rico, no puede haber capitulación válida otorgada bajo la ley puertorriqueña que no conste en escritura pública. Al amparo de nuestro ordenamiento, una capitulación en Puerto Rico otorgada en documento privado es una contradicción en términos; simplemente no existe. Le falta un requisito esencial, pero por su esencialidad no deja de ser formal. **El defecto recae sobre la forma, no el fondo del documento.**

Sin embargo, ¿qué de un contrato capitular otorgado al amparo de otra legislación? Se ha de gobernar, en cuanto a su forma, por la

---

Los conflictos jurisdiccionales en cuanto a la sustancia del negocio jurídico concluido en el extranjero se resuelven, si de personas y bienes muebles se trata, mediante el estatuto personal, y si de inmuebles, mediante el estatuto real (Art. 10) de nuestro Código Civil.

[19]Art. 1278, Código Civil, 31 L.P.R.A. sec. 3562.

legislación del territorio donde se otorga. ¿Y qué de su contenido, de las disposiciones sustantivas que determinan el régimen económico que ha de regir el matrimonio? A ellas les aplica la ley de los otorgantes del contrato, por razón del estatuto personal.

II

Aclarados estos conceptos, abordamos el problema de la forma. La realidad es que en torno a los contratos formales, se levanta la interrogante: ¿qué derecho ha de regir —no la dimensión sustantiva de un negocio jurídico que el ordenamiento considera suficientemente importante como para calificar de solemne—, sino la dimensión formal del mismo, aquella que diferencia este contrato de los ordinarios?

El estatuto formal permite contestar esta interrogante. La regla que encarna —locus regit actum (el lugar rige el acto), también llamada lex loci actus (la ley del lugar de los actos)— "establece el principio de que en el otorgamiento de un acto o contrato en una jurisdicción extranjera las partes deben cumplir con todas las formas y solemnidades exigidas por las leyes de ese lugar." Vda. de Ruiz v. Registrador, 93 D.P.R. 914, 921 (1967); Véase también Armstrong v. Armstrong, 85 D.P.R. 404, 410-414 (1962).

La norma locus regit actum debe su existencia a conflictos sobre contratos formales o solemnes, fuere la solemnidad requerida en el foro extranjero o en el patrio.[20] Un contrato que se considerare meramente consensual en ambas jurisdicciones no presentaría problemas al juzgador en cuanto a las formalidades que debieron enmarcar su constitución. No habría, en ese caso, formalidad que problematizar. Sólo le competería al juzgador dilucidar si hubo consentimiento de las partes contratantes, objeto sobre el cual establecer la obligación y causa que la justificare. Huelga mencionar que estos tres requisitos —consentimiento, objeto y causa—, son los elementos sustantivos, de fondo, del negocio jurídico contractual.

_____

[20]Para el origen de la doctrina, consultar Bartolus de Sassoferrato, Bartolus on the Conflict of Laws (trad. Joseph Henry Beale) págs. 17-18 (1979).

**No entran, por definición, en la esfera de competencia del estatuto formal.**

**El estatuto formal sólo aplica a actos jurídicos en los que la forma importa**, del mismo modo que el derecho penal sólo aplica a actos que conllevan pena, el ambiental a actos que injieran en el medio ambiente y el mercantil a actos realizados en el mercado. **Resolver que es inválido en Puerto Rico el contrato privado de capitulaciones otorgado en Maryland de acuerdo a la forma exigida en ese estado[21] equivale a derogar implícitamente el estatuto formal.**

III

Previo a la enmienda que sufrió el título preliminar del Código Civil Español en 1974, la doctrina española no había decidido de manera contundente si las capitulaciones matrimoniales otorgadas por nacionales españoles en el extranjero habían de regirse, **en cuestión de forma**, por el derecho patrio o el del lugar del otorgamiento. Reconocemos que todos los tratadistas consideran indispensable para la existencia misma del contrato capitular que se otorgue en

escritura pública.[22] **Tan categórico dictamen, sin embargo, se ha referido, en casi la totalidad de las situaciones, a capitulaciones otorgadas en suelo nacional español por nacionales españoles.**[23] Se ha

---

[21]El estado de Maryland sólo dispone que serán válidos los contratos entre cónyuges relativos a "alimony, support, property rights, or personal rights". Ann. Code of Md., sec. 8-101 of the Family Law Article (1999). No establece mayores requisitos de forma que los de los contratos en general. Por tanto, no se requería siquiera la firma de los comparecientes ante notario para la validez de las capitulaciones.

[22]Sin pretensión de agotarlos, véase J. Castán Tobeñas, <u>Derecho Civil Español Común y Foral</u>, Tomo 5, Vol. I, págs. 348-349 (1994); J. M. Manresa y Navarro, <u>Comentarios al Código Civil Español</u>, Tomo 9, págs. 196-211 (1969); J. Puig Brutau, <u>Fundamentos del Derecho Civil</u>, Tomo IV, Vol. I, págs. 407-412 (1967); Q. M. Scaevola, <u>Código Civil Comentado y Concordado</u>, Tomo 21, págs. 226-245 (1967).

[23]El debate se centra en el aparente conflicto entre el Art. 1278 del Cód. Civ. Español (Art. 1230 nuestro) que da eficacia a los contratos cualquiera que sea su forma, y el Art. 1321 del Cód. Civ. Español (Art. 1273 nuestro), que exige escritura pública para las capitulaciones matrimoniales. Esta fue la única controversia que decidió la jurisprudencia española en la sentencia del Tribunal Supremo del 10 de

discutido muy poco el supuesto de nacionales españoles que capitulan en el extranjero sin establecer un domicilio conyugal fuera de España. La omisión es comprensible; el caso, admitimos, es poco usual.

Del mismo modo, la discusión del Art. 11 del Código Civil –que, previo a la reforma de 1974 era idéntico al nuestro–, y de la norma locus regit actum, los tratadistas iberos se ciñen a la aplicabilidad de la norma a los "testamentos, contratos y demás instrumentos públicos" en forma general, abordando en contadas ocasiones el tema de las capitulaciones. También este trasfondo es comprensible, ya que son esas figuras las que se mencionan explícitamente en el estatuto. Pero la comprensibilidad de la omisión no abona a nuestro análisis.

El reputado internacionalista Adolfo Miaja de la Muela indica que "[e]n cuanto a la forma [del contrato de capitulaciones matrimoniales], la regla locus regit actum se aplicará en ocasiones con carácter obligatorio y otras facultativamente, pero si se refieren a las capitulaciones de bienes inmuebles, habrá que tener presentes las leyes del país donde estén situados, especialmente a efecto de publicidad y de oponibilidad contra terceros."[24] Apunta así a una distinción muy importante –entre formas de existencia y formas de publicidad–, constante en la doctrina. Consiste en diferenciar las condiciones formales que se requieren

para la existencia de un negocio jurídico, de aquellas que se piden para su inscripción y constancia en un registro. El testamento ológrafo es ilustrativo: exige exiguas formalidades para su existencia, pero requiere su protocolización para que sus disposiciones relativas a bienes inmuebles sean inscribibles en el Registro de la Propiedad. No se trata aquí de una excepción a la regla locus regit actum, sino de una remisión

_____

junio de 1912.  No se resolvió la aplicabilidad del principio de locus regit actum.

[24]Adolfo Miaja de la Muela, 2 Derecho Internacional Privado, págs. 364–365 (9ª ed. 1982).

al estatuto real, Art. 10 del Código Civil, en materia estrictamente registral.

Otros autores españoles que discuten el matrimonio y su régimen económico a la luz del derecho internacional privado, también hacen manifestaciones generosas en cuanto a la forma de los actos realizados por nacionales españoles en el extranjero.[25]

Es interesante la propuesta de Elisa Pérez Vera, enmarcada en el Art. 11 **revisado** del Código Civil español.[26] Ella explica que las

---

[25]Hay excepciones y a ambos lados de la polémica. Sostiene Manuel Lasala Llanas, del lado más hostil a la norma de locus regit actum, que dicha regla no aplica, inter alia, a "las capitulaciones matrimoniales, en el caso a que se contrae el artículo 1.321 del Código Civil". Atribuye la exclusión a una "excepción legal" fundamentada en la exigencia de "formalidades especiales para asegurar la autenticidad de aquellos actos o contratos que deban producir efecto respecto a terceros, y, por consiguiente, son leyes de orden público." Manuel Lasala Llamas, Sistema Español de Derecho Civil Internacional e Interregional, pág. 31 (1933).

José Ramón de Orúe y Arregui, Manual de Derecho Internacional Privado, págs. 748-749 (1952) atribuye la excepción a la regla de locus regit actum a la citada Sentencia de 1912 del Tribunal Supremo español, a nuestro juicio erróneamente, pues no fue esa la controversia allí resuelta.

[26]"Por su parte, la forma del contrato se encuentra sometida, en principio, a la regla general locus regit actum, recogida en el artículo 11, párrafo 1.º del Código Civil, con carácter facultativo, así como las conexiones alternativas (nacionalidad común y ley rectora del contenido) que en el mismo se consagran. Ahora bien, no hay que olvidar que el párrafo 2.º del artículo 11 establece que «si la ley reguladora del contenido de los actos y contratos exigiere para su validez una determinada forma o solemnidad, será siempre aplicada, incluso en el caso de otorgarse aquéllos en el extranjero». Lo que significa, en el tema que nos ocupa, que cuando la ley española rija el fondo del contrato sobre bienes con ocasión del matrimonio, el artículo 1.321 y conexos (tanto del Código Civil como del Código de comercio) recibirán proyección internacional por incorporar requisitos formales ineludibles.

No obstante, si atendemos a la finalidad perseguida tanto por la exigencia de escritura pública como por la necesaria inscripción registral, la noción de equivalencia de las instituciones debe permitir la remisión a cada derecho interno la tarea de concretar los medios necesarios y suficientes para alcanzarla. En efecto, de lo que se trata, en suma, es de establecer niveles razonables de certeza acerca de la fecha de otorgamiento y de la identidad de las partes; óptica desde la que puede resultar insuficientes la norma material inserta en el Convenio de la Haya citado, a tenor de la cual, con independencia de las disposiciones establecidas por la ley rectora de la forma, el contrato en cuestión será siempre objeto de un escrito fechado y firmado por los dos esposos (arts. 12 y 13 del Convenio)." Elisa Pérez Vera, Derecho Internacional Privado, pág. 206 (1980) [citas omitidas].

capitulaciones están sometidas, en principio, a la regla <u>locus regit</u> <u>actum</u>, pero que se exceptúan de esa norma por el segundo párrafo del Art. 11 español,[27] **que no tiene correspondencia en Puerto Rico.** Sólo aplican las solemnidades españolas por razón de un estatuto explícito. Aún así, sostiene Pérez Vera, quedan controversias en torno a la aplicabilidad extraterritorial de las solemnidades que impone la ley nacional ante la posible falta de correspondencia de instituciones entre el derecho nacional y el extranjero.

Lo expuesto nos revela una lección: si en España hay dificultad al comparar la naturaleza, función y competencia de un funcionario autenticador nacional, como es un notario, con las instituciones extranjeras, más aún ha de haberla en Puerto Rico, debido a nuestras relaciones con los Estados Unidos, donde hay una concepción tan distinta del contrato, de los regímenes matrimoniales y del notariado. Sin embargo, esta discrepancia no es razón para obviar la regla de <u>locus regit actum</u>, sino de reafirmar su relevancia.

Para hacer patente la discrepancia, basta repetir nuestras palabras en <u>In re: Colón Muñoz</u>, 131 D.P.R. 121, 127-129 (1992):

> "En apretada síntesis, el notario latino es aquel profesional del Derecho **que ejerce una función pública que consiste en recibir, interpretar y dar forma legal a la voluntad de las partes, dar fe de los hechos, redactar los instrumentos adecuados a ese fin, conferirles autenticidad, conservar los originales de éstos y expedir copias que den fe de su contenido.** En dicha función el notario puertorriqueño representa la fe pública y la ley para todas las partes. [...]
>
> En su función pública ejerce la fe pública notarial, la cual conlleva un doble contenido, a saber: (1) en la esfera de los hechos, la exactitud de lo que el notario ve, oye o percibe por sus sentidos, y (2) **en la esfera del Derecho confiere autenticidad y fuerza probatoria a las declaraciones de voluntad de las partes en el instrumento público redactado conforme a su juicio sobre los preceptos del ordenamiento jurídico para la validez y eficacia del acto o contrato formalizado, y sobre la identidad y capacidad de las partes.**

---

Discutiremos más adelante la Convención de la Haya de 14 de marzo de 1978 sobre el derecho aplicable a los regímenes patrimoniales del matrimonio.

[27]De más está decir que el segundo párrafo del Art. 11, al que se refiere la profesora Pérez Vera, no tiene correspondiente en Puerto Rico, donde mantenemos la redacción anterior a la reforma española de 1974.

[...]

**El notario del <u>common law</u>, por el contrario, no es un jurista o abogado y su función se limita al reconocimiento y autenticación de firmas.** Este tipo de notario existe en los países siguientes: Estados Unidos, Gran Bretaña, Australia, Nueva Zelandia, Canadá (excepto Quebec), India, Malasia, Singapur, Hong Kong y Nigeria, entre otros." [Citas omitidas, énfasis suplido]

Frente al notario latino que opera en Puerto Rico, el notario del <u>common law</u> es jurídicamente incapaz de otorgar la misma fe pública, autenticidad y fuerza probatoria a los documentos que suscribe. "La labor principal de los notarios estadounidenses es prevenir el fraude al verificar la identidad de las personas que prestan juramentos y hacen reconocimientos [<u>acknowledgements</u>] en documentos a emplearse dentro de los Estados Unidos. Estos notarios no están autorizados a preparar documentos legales de tipo alguno excepto en el estado de Louisiana, donde los notarios siguen la práctica del derecho civil, y en Puerto Rico, donde los notarios tienen que ser abogados. Los documentos de notarios de Estados Unidos no pueden ser aceptados en países extranjeros ni les es nunca concedido el rango de instrumento público."[28] Es imposible, por tanto, otorgar una escritura pública –tal como la conocemos en nuestro ordenamiento– ante un notario de la tradición del <u>common law</u> en los Estados Unidos.

IV

El campo de la doctrina científica está, pues, dividido y lo ha estado por buen tiempo. Ante esta discrepancia, osaremos una proyección histórica de los artículos que nos conciernen. El Art. 1273 de nuestro Código Civil ya mencionado, se tomó del Art. 1321 español, pero éste no es invención de los codificadores iberos. El origen de la exigencia moderna de escritura pública en el otorgamiento de capitulaciones matrimoniales proviene, en última instancia, del Código Civil francés de 1804 (el llamado **Code Napoléon**), que consignaba en su Art. 1394 el requisito que aún prevalece en nuestro ordenamiento. Merece

---

[28]John E. Seth, <u>Notaries in the American Colonies</u>, 32 John Marshall Law Review 863, 885-886 (1999) [Traducción nuestra, citas omitidas.

consideración, entonces, la interpretación que la doctrina francesa ha dado a esta área del derecho.

Los juristas franceses, contrario a los españoles, han discutido extensamente la aplicación de la regla locus regit actum a las capitulaciones matrimoniales otorgadas por sus nacionales en el extranjero. **Su veredicto ha sido a favor de la norma de derecho internacional privado.**[29] De interés particular es la postura asumida por Marcel Planiol.

> "Conforme al derecho común de los actos jurídicos, el contrato antenupcial está sujeto a la regla locus regit actum; pero, toda vez que es facultativa, cuando las partes sean de una misma nacionalidad, pueden legalmente celebrar sus convenciones matrimoniales según la forma establecida por su ley personal. El contrato entre dos franceses, celebrado en país extranjero, podrá redactarse, por tanto, en la forma francesa, si las partes lo hacen ante el agente diplomático o el cónsul francés, **o en la forma auténtica dispuesta por la ley extranjera, o aún por documento privado, si la ley local lo admite.**"(Énfasis suplido).[30]

Para 1927, en el Institut de Droit International, se debatía aún la relación entre el Art. 1394 del Código Civil francés y la regla locus regit actum. La posición victoriosa, planteada por Weiss y Audinet, declaró la aplicación de locus regit actum al contrato de capitulaciones matrimoniales, **de manera facultativa**, salvo disposición **expresa** de la ley nacional proyectando sus requisitos formales extraterritorialmente.[31] Pero las discusiones doctrinales, aunque muy importantes en el plano científico, eran, desde hace casi un siglo, doblemente académicas: los

---

[29]Laurent discrepa, negando la aplicabilidad del principio de locus regit actum tanto a las capitulaciones como a los demás contratos solemnes, remitiendo las primeras a la ley del país de los futuros cónyuges –o, en caso de ser de distintas nacionalidades, a la ley del marido– y los segundos al lugar de radicación de los bienes objetos del contrato. Atribuye su tesis, en extremo radical y restrictiva, al "interés social". Su posición, sin embargo, era minoritaria. Georges Wiederkehr, Les Conflits de Lois en Matiére de Régime Matrimonial (Bibliothéque de Droit International Privé, eds. Henri Batiffol y Philippe Francescakis) págs. 240-241 (1967).

[30]Marcel Planiol, Georges Ripert, 8 Tratado Práctico de Derecho Civil Francés (trad. Mario Díaz Cruz) pág.126 (1938).

[31]Wiederkehr, ob. cit., pág. 241. El legislador español optó en 1974 por hacer expresa esa aplicación. El puertorriqueño no se ha manifestado de ese modo.

tribunales franceses habían resuelto desde 1816 que un contrato de capitulaciones matrimoniales otorgado por franceses en el extranjero mediante documento privado era válido en Francia si esa forma estaba autorizada por la ley del lugar del otorgamiento.[32]

Así, la jurisprudencia y la doctrina francesa se ha declarado unánimemente a favor de locus regit actum en materia de capitulaciones matrimoniales. No sólo han declarado la aplicabilidad de esta norma, sino también la han entendido facultativa.[33] "Las formas del contrato de capitulaciones matrimoniales se determinan por la ley del lugar donde en contrato es otorgado, conforme a la máxima locus regit actum, tomándose cuenta eventualmente su carácter facultativo. La pregunta que más se ha planteado consiste en saber si la **exigencia de escritura pública** no dependería del estatuto personal. Se ha resuelto a favor de la aplicación de la ley local conforme a las soluciones generales admitidas en la competencia de dicha ley: la ley local decide si el contrato debe ser notarizado."[34]

V

A nivel internacional e interregional la doctrina también se ha orientado hacia un consenso que favorece la regla locus regit actum. La Convención del 14 de marzo de 1978 sobre el derecho aplicable a los regímenes patrimoniales del matrimonio –aprobada en la 13ª Conferencia de la Haya de Derecho Internacional Privado y en efecto desde el 1ro de septiembre de 1992–, **requiere sólo la constancia de fecha cierta y firma**

---

[32]Tribunal de grande instance, París, sentencia del 11 de mayo de 1816. Los tribunales franceses han reiterado esta jurisprudencia en 1828, 1832, 1855, 1865, 1887, 1896, 1922 y 1973 Cf. Henri Batiffol y Paul Lagarde, 2 Droit International Privé pág. 376 (1983); Yvon Loussouarn, Droit International Privé pág. 500 (1978); Planiol y Ripert, supra; 1 Répertoire de Droit Civil (eds. Emmanuel Vergé y Georges Ripert) pág. 948 (1951); Wiederkehr, supra, pág. 242.

[33]Así también nuestra jurisprudencia ha entendido la aplicación del Art. 11 del Código Civil. Vda. de Ruiz v. Registrador, 93 D.P.R. 914, 921-923 (1967).

[34]Batiffol y Lagarde, ob.cit., pág. 376 [traducción nuestra, énfasis en original].

**de las partes como criterio universal para la validez de un contrato de capitulaciones matrimoniales**. Cumplidos estos requisitos

mínimos, se exige que la forma del contrato "cumpla con la ley interna aplicable al régimen patrimonial del matrimonio, o a la ley interna del lugar donde se otorgue". Los futuros cónyuges también pueden estipular cuál ley ha de aplicar, mediante pacto expreso que se atenga a la misma forma que las capitulaciones. Sólo la "incompatibilidad manifiesta con el orden público" puede negar la aplicación de la normativa de la Convención.[35] La Convención, por supuesto, sólo es obligatoria entre los países que la ratifiquen y esto no ha ocurrido con respecto a España (por razón de las recientes enmiendas al Código Civil, que excluyen esta normativa) o, a los Estados Unidos (por razón de la complejidad de su derecho interno). La Convención demuestra, sin embargo, la dirección que ha tomado el derecho internacional privado en las últimas décadas.

En Estados Unidos, en cuanto a conflicto de leyes interestatal, la ruta ha sido la misma, pero el mecanismo distinto. Más que establecer normas sobre conflictos de leyes interestatales se ha intentado homogeneizar la legislación de los distintos estados en cuanto a los contratos de capitulaciones matrimoniales. En 1983, la National Conference of Commissioners on Uniform State Laws (N.C.C.U.S.L.) aprobó y recomendó el Uniform Premarital Agreement Act (UPAA). Su segundo artículo requiere que una capitulación matrimonial conste por escrito y esté firmada por ambas partes.[36] Establece también que el contrato no tendrá otra causa ("consideration") que el matrimonio mismo.[37] Al día de hoy, la

---

[35]Convención sobre el derecho aplicable a los regímenes patrimoniales del matrimonio, (Núm. XXV de la 13ª Conferencia de la Haya de Derecho Internacional Privado, 14 de marzo de 1978), Arts. 12, 13 y 14.

[36]"**Formalities**. A premarital agreement must be in writing and signed by both parties. It is enforceable without consideration." Uniform Premarital Agreement Act, section 2 (N.C.C.U.S.L., 1983).

[37]"Section 2 also restates what appears to be the almost universal rule regarding the marriage as consideration for a premarital agreement." Uniform Premarital Agreement Act, Comments on section 2.

mitad de los estados[38] y el Distrito de Columbia han adoptado el proyecto. La urgencia del proyecto se dramatiza en su "Prefatory Note", que cita la movilidad de la población entre los estados norteamericanos como un agravante del problema de aplicabilidad de los contratos pre-matrimoniales.

## VI

Los tratadistas de derecho internacional privado apuntan al orden público internacional como concepto regente de la materia de conflicto de leyes. Para Batiffol, existe un orden público internacional, formado de las directrices que constituyen el conjunto de relaciones entre los estados y entre los ciudadanos de esos estados. En este orden se dan múltiples relaciones personales y comerciales

entre individuos de diversos domicilios y nacionalidades.

Miaja de la Muela, a su vez, reconoce que este orden internacional se enfrenta a veces, en la mente del juzgador, al orden público nacional, sufriendo el mayor el embate del menor, en manos de un juez parcializado –acaso inevitablemente– a favor de sus propias leyes. Es entonces el tráfico comercial entre diversas naciones, el logro cultural que ha representado el cosmopolitismo, la coexistencia e interrelación entre individuos, que queda mancillada. No hay duda que pueden haber normas extranjeras

tan aberrantes a la moral de nuestro pueblo que no admitan su aplicabilidad por nuestros tribunales, pero "existe también coincidencia entre los cultivadores del Derecho internacional privado en considerar como sumamente peligrosa esta facultad en tribunales naturalmente

---

[38]Arizona, Arkansas, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Texas, Utah y Virginia.

El estado de Maryland no lo ha hecho aún, pero su normativa en cuanto a las capitulaciones matrimoniales es aún menos exigente que la propuesta por el U.P.A.A.

inclinados a seguir el camino de menor esfuerzo, la aplicación de sus propias leyes materiales."[39]

Ya antes declaramos que "[l]e sería muy difícil a una persona alejada de su país en ciertas ocasiones, cumplir con todos los requisitos legales de su derecho patrio, porque la persona ante quien se va a realizar un acto o contrato desconoce totalmente esas exigencias, y en otras, **porque el ordenamiento jurídico donde se desea efectuar el otorgamiento no dispone de los mecanismos jurídicos formales adecuados o no es capaz de proveer los medios necesarios para que el otorgamiento se ajuste a las exigencias de las leyes de su nación.**" Vda. de Ruiz v. Registrador, 93 D.P.R. 914, 921-922 (1967) [Enfasis suplido].

En materia de testamentos otorgados por nacionales puertorriqueños en el extranjero, ámbito también al alcance de la norma locus regit actum, hemos asumido una postura muy distinta a la hoy planteada por la pluralidad del Tribunal. En Cabrer v. Registrador, 113 D.P.R. 424, 433 (1982), declaramos que "para que se inscriba en Puerto Rico un testamento otorgado fuera de esta jurisdicción, compete a la parte interesada en ello acreditar que se cumplieron en su otorgamiento las formas y solemnidades requeridas por las leyes del lugar de su otorgamiento. Vda. de Ruiz v. Registrador, supra; Esteves, Comisionado v. Registrador, 43 D.P.R. 7 (1932); y Rojas, Randall & Co. v. Registrador, 27 D.P.R. 21 (1919). No hacerlo constituye un defecto subsanable según se resolvió en este último caso."

También la ley inmobiliaria se muestra más tolerante en cuanto a la inscripción de negocios jurídicos otorgados en el extranjero que transmiten títulos de bienes inmuebles sitos en Puerto Rico. Explica el Art. 46 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2209, que "los documentos otorgados fuera de Puerto Rico podrán ser inscritos si reúnen los requisitos siguientes", entre los

---

[39]Miaja de la Muela, 1 Derecho Internacional Privado, pág. 342 (2ª ed. 1956).

que se enumera, el "[q]ue en el otorgamiento se hayan observado las formas y solemnidades del territorio o país donde se han verificado los actos o contratos, o las de Puerto Rico", "[q]ue el documento contenga la legalización y demás requisitos necesarios para su autenticación en Puerto Rico" y, "[q]ue dicho documento haya sido protocolizado por un notario en Puerto Rico si para su eficacia no requiere trámite judicial".[40]

Ante la posición de avanzada asumida por este Tribunal, en torno a la validez de los testamentos otorgados fuera de Puerto Rico, y la normativa de la Ley Hipotecaria respecto a la inscripción de los negocios jurídicos realizados en el exterior, no se justifica hacer una excepción en el caso de las capitulaciones matrimoniales. Si bien, éstas revisten de un alto interés público, también los otros negocios jurídicos gozan de tal interés. El mercado de inmuebles –que tiene enormes

repercusiones para el desarrollo y la planificación

económica del país–, y el régimen testamentario –que

constituye uno de los principales modos de transmitir la

propiedad en nuestro sistema y, a la par repercute en la esfera familiar, a nivel privado, y tributaria a nivel público–, tienen de tanto interés público como el régimen matrimonial. ¿A qué responde entonces el trato más que preferente que la mayoría del Tribunal hoy da a este último negocio jurídico?

**No hemos de ser tan nacionalistas en la aplicación de nuestro derecho como para favorecer a los que incumplen con las formas**

---

[40]Ateniéndonos a estas disposiciones, un contrato de capitulaciones matrimoniales otorgado en el extranjero en el que se transfieran títulos sobre bienes inmuebles sitos en Puerto Rico podría entrar al Registro de la Propiedad si se cumplen los requisitos de la Ley Hipotecaria al constatar que se cumplieron las formalidades requeridas en el lugar del otorgamiento y al protocolizar el contrato de capitulaciones por un notario puertorriqueño. Como el contrato de capitulaciones matrimoniales que tenemos ante nos no contiene traspaso de título inmobiliario alguno, no surgen problemas de publicidad registral al no haber sido notarizado.

**extranjeras, si son más estrictas, y condenar a los que las cumplen, sólo si son más laxas que las nuestras.** Ciertamente, en apariencia, nuestro ordenamiento plantea un fraccionamiento del negocio jurídico. Pero esta contrariedad, que es más técnica que sustancial, queda subordinada ante la imposibilidad que enfrenta un domiciliado puertorriqueño al tratar de cumplir con formas y solemnidades inexistentes en el lugar donde al momento ubica. Esta imposibilidad, génesis de la regla locus regit actum, se reitera a diario en nuestra isla y en el extranjero; nos aconseja mesura al extender nuestro derecho más allá de sus playas.

Entendemos deferencialmente, que la invalidación de las capitulaciones otorgadas por los comparecientes López Torres y González Vázquez, es una aplicación inoficiosa de un insularismo jurídico extremo. A la luz del verdadero significado y alcance del estatuto formal, confirmaríamos la sentencia del Tribunal de Circuito de Apelaciones (Hons. Arbona Lago, Salas Soler y Negroni Cintrón).

ANTONIO S. NEGRÓN GARCÍA

Juez Asociado