Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se une el Juez Presidente Señor Hernández Denton.
Disiento del análisis de la mayoría de este Tribunal cuyo efecto es darle preeminencia, injustificadamente, a las disposiciones legales de otra jurisdicción, ignorando las normas vigentes en la nuestra. Este caso nos requiere de-cidir qué implicación tiene, para propósitos de una división de bienes posdivorcio realizada en Puerto Rico, el que las partes, mientras estaban casadas bajo el régimen de Socie-dad de Bienes Gananciales de Puerto Rico, hubiesen sus-crito un contrato permitido por las leyes del estado de Florida para transferir a título privativo de la esposa un bien *119 inmueble sito en ese estado, adquirido por la pareja du-rante el matrimonio.(1) La respuesta que brinda la Opinión mayoritaria es que debemos subordinar la normativa puer-torriqueña, que prohíbe la contratación y donación entre cónyuges y dispone la inmutabilidad del régimen matrimonial, a la de Florida porque la Constitución de Estados Unidos así lo ordena. Esta solución es errónea tanto con-forme a nuestro ordenamiento como al de Estados Unidos.
I
La Constitución de Estados Unidos establece que “[s]e dará entera fe y crédito en cada estado a los actos públicos, documentos y procedimientos judiciales de los otros estados”.(2) Esta disposición constitucional, conocida como la de full faith and credit, no cuenta con estatutos que ayuden a descifrar su alcance o estandarizar su aplicación. No obstante, el Tribunal Supremo de Estados Unidos ha establecido que no se trata de un mandato inexorable. Asi-mismo, ha reconocido que la disposición aplica tanto a las sentencias judiciales como a las leyes de los diferentes es-tados y territorios de Estados Unidos, pero no de la misma manera.(3)
Los factores para determinar si un estado o territorio está obligado a emplear las leyes y regulaciones de otro por razón de la cláusula de entera fe y crédito difieren sustan-cialmente de las que debe considerar un tribunal para deci-dir si hace valer las sentencias dictadas en otra jurisdicción. *120 Esto se debe a que cada estado o territorio tiene legitimidad para implementar la política pública que entienda más apropiada, a través de sus propias leyes.(4) Esa potestad es parte de la esencia de los sistemas federalistas, cuyos com-ponentes ceden el control sobre ciertos asuntos, pero conser-van autonomía sobre muchos otros. En palabras del Tribunal Supremo de Estados Unidos:
La naturaleza misma de una unión federal de estados, en la que cada uno de éstos mantiene su derecho soberano para pro-mulgar sus propias leyes, impide recurrir a la Constitución como medio para compeler a un estado a subordinar por com-pleto sus leyes y políticas concernientes a sus asuntos domés-ticos peculiares a las leyes y políticas de otros estados. (Tra-ducción nuestra.(5)
El “estado foro”, aquel donde se está atendiendo el caso, no tiene que subordinar automáticamente su ley a la de otra jurisdicción también aplicable a la controversia, sino que tiene la oportunidad de escoger, entre las dos políticas estatales conflictivas, la que es más adecuada para atender el caso. Además, no se le puede exigir a un estado o terri-torio aplicar la ley de otra jurisdicción cuando ésta se oponga a la moral o los principios básicos del foro.(6) La clave para la selección se encuentra en determinar, por un lado, si aplicar la ley del foro constituiría un acto arbitrario y, por el otro, si la ley extranjera es contraria al orden público del foro. El “estado foro”, entonces, tiene que deci-dir si los intereses por los que vela su ley tienen mayor peso que los del foro alternativo, y para ello debe conside-rar el respeto que merece la ley del otro, si las partes están debidamente informadas sobre la ley que se pretende apli- *121 car y los contactos de cada estado con las partes y la controversia. (7) Si el foro tiene contactos significativos con la controversia, de modo que exista un interés del estado o territorio en el pleito, puede aplicar su propia ley, y más aún cuando la ley conflictiva de la otra jurisdicción va contra su política pública. (8)
La cláusula de entera fe y crédito presenta serias dificul-tades como vehículo de unificación de los diversos sistemas legales estatales de Estados Unidos, pues su lenguaje y su historia demuestran que no se diseñó para resolver disputas sobre la ley estatal aplicable, y el texto no le prohíbe a los estados y territorios aplicar sus propias leyes en casos de conflicto si tienen bases legítimas para hacerlo.(9) Asimismo, los estudiosos estadounidenses concuerdan en que la Cons-titución federal no provee guías adecuadas para seleccionar la ley estatal más apropiada para la resolución de cada con-troversia ni el Congreso ha legislado con claridad al res-pecto, por lo que es necesario recurrir a las normas de con-flicto de leyes para hacer esa determinación. (10)
Para propósitos de las doctrinas sobre conflicto de leyes, se consideran extranjeras las jurisdicciones que tienen le-gislación propia sobre ciertas materias que pueda ser incompatible con la del foro. Así, al interior de sistemas fe-derales, donde coexisten diversas legislaciones estatales, como en Estados Unidos, se dan colisiones entre cuerpos de ley extranjeros. Lo mismo sucede en sistemas unitarios con legislaciones torales, como España.(11) Señala el académico *122 Kurt Nadelmann, en referencia a cómo se han atendido estos conflictos en Estados Unidos, y que los problemas para seleccionar la ley aplicable no son más fáciles de resolver porque surjan en una unión federal.(12) Y es que este tipo de casos no se puede resolver diciendo simplemente que se le va a dar deferencia a un estado por estimarlo “hermano” y se va a aplicar su ley en lugar de la propia.(13)
La doctrina constitucional estadounidense indica que no es razonable esperar que siempre que haya un conflicto de leyes se le dé deferencia a la legislación del otro estado. La jurisprudencia federal más reciente permite a los estados y territorios aplicar sus leyes y políticas, siempre que tengan interés en la disputa y una base racional para preferir sus normas.(14) En este caso, no se trata de rechazar la ley de Florida solamente porque es distinta a la nuestra,(15) sino porque el estatuto de ese estado que podría aplicar a la controversia contraviene la política pública vigente en Puerto Rico.
II
A. El matrimonio y el régimen de bienes matrimonia-les siempre han representado áreas de trabajo complejas para el derecho internacional privado, por la importancia social de dicha institución, que está concebida para ser per-manente, mas puede disolverse en cualquier momento. Los innumerables cambios que puede experimentar el matri-monio en un mundo donde cada estado lo regula de modos diferentes y cada día hay mayor movilidad, dan lugar a conflictos de leyes internacionales e interestatales que no *123 se han atendido de manera uniforme.(16) Más bien, la tras-cendencia de las situaciones que involucran bienes matri-moniales y el interés de que cualquier división se lleve a cabo de manera que resulte justa y satisfactoria para la vida posterior de los excónyuges obligan a desarrollar dife-rentes políticas de selección de la ley aplicable (choice of law), de acuerdo con las diversas circunstancias que se enfrenten.(17)
No obstante, a medida que se ha estudiado el conflicto de leyes en el matrimonio, los tribunales y los tratadistas han coincidido en que es necesaria la unicidad. Esto es, seleccionar un cuerpo de leyes que sirva como única refe-rencia para resolver todas las controversias sobre la parti-cipación de los esposos en las propiedades que poseen.(18) En su tratado sobre “distribución equitativa”, Turner in-dica que la práctica mayoritaria en Estados Unidos de dividir todos los bienes posdivorcio según una sola ley, que suele ser la ley del foro, es la mejor política. Esto primero, por la razón práctica de que facilita la función judicial al no obligar a los tribunales a estudiar las leyes de otros esta-dos y a recibir prueba para clasificar cada activo de forma individual, y segundo, porque cada estado tiene su con-junto de políticas sobre derecho de familia y al aplicar de manera fragmentada las leyes de distintos estados se puede llegar a resultados incongruentes o injustos.(19)
El sistema para regir los bienes matrimoniales en Esta-dos Unidos se divide en dos grandes categorías: los estados *124 que utilizan las doctrinas del common law y los que em-plean ordenamientos de origen civilista (community property states). Dentro de esos dos grupos, cada estado tiene sus propias reglas de clasificación y división posdivorcio. El sistema de Florida pertenece al primer grupo, mientras que el de Puerto Rico es similar al de los estados del se-gundo grupo.
Los conflictos de leyes en Estados Unidos surgen prin-cipalmente cuando se tienen que dividir los bienes luego del divorcio y la pareja posee muebles e inmuebles en dis-tintos estados, unos con régimen de common law y otros en los que imperan normas de community property. La mayor incompatibilidad se da cuando la pareja ha estado domici-liada en distintos estados y tiene que dividir bienes sitos en una jurisdicción de common law dentro de un procedi-miento que se lleva a cabo en un community property state o vicecersa.(20)
La selección de la norma que regirá la división es esen-cial porque en los community property states existe una presunción de que todos los bienes adquiridos durante el matrimonio pertenecen por partes iguales a ambos cónyu-ges, a menos que se establezca un régimen distinto al casarse. Esa norma prevalece tanto durante el matrimonio como en la división posdivorcio. Mientras, en los common law states no opera esta presunción y la propiedad perte-nece al cónyuge que la haya adquirido durante el matrimo-nio, por lo que todos los bienes podrían pertenecerle a una sola persona. La mayor parte de estos estados recurre en-tonces a la distribución equitativa para resolver el pro-blema de que el cónyuge que no posee bienes de forma separada al momento del divorcio se quede sin medios para subsistir. De esta forma, los bienes de ambos excónyuges se *125 asignan entre ellos según sus circunstancias particulares, sin depender necesariamente del título legal sobre las co-sas ni repartirlas en partes iguales.(21)
Sin embargo, esa propiedad separada característica de una jurisdicción de common law se consideraría privativa de su dueño en un estado regido por las normas de community property. En ese caso, no habrían bienes gananciales que dividir. Para atender este problema, de manera que el cónyuge que no tiene propiedades a su nombre no quede desprovisto, las normas de conflicto de leyes sugieren cla-sificar las propiedades adquiridas fuera del community property state como si se hubiesen adquirido en éste. Así, un inmueble recibido por algún miembro de la pareja du-rante el matrimonio se reputaría matrimonial, siempre que no pudiera considerarse privativo como lo sería una herencia. (22) Esta clasificación para efectos de división se conoce como cuasicomunidad.(23) En la situación contraria, cuando la propiedad ganancial o privativa situada en un community property state se va a dividir en uno de common law, afloran problemas para la clasificación, pues los bie-nes no pueden convertirse automáticamente en matrimo-niales o separados, ya que las características de las cate-gorías no son iguales en ambos sistemas. Para evitar incongruencias, todos los bienes se dividen según un solo sistema.(24) Es decir, se utiliza la unicidad del patrimonio y se selecciona una sola ley para la división.
La práctica generalizada en los últimos años en Estados Unidos, tanto en estados con régimen de common law como en los de community property, ha sido la de aplicar a todas las propiedades las normas del foro, en lugar de las de estados extranjeros. En los common law states, se han apli- *126 cado las leyes locales para la clasificación, y distribución equitativa, ya sea por una política de que los estatutos pro-pios son los que reglamentan ese tipo de casos o porque, como suele determinarse, el foro es el estado con mayor relación significativa con la controversia. Asimismo, en la mayor parte de los community property states, se ha legis-lado para que el foro aplique su ley de división y clasifique los bienes ubicados en otros estados según la normativa de la cuasicomunidad.(25)
Esta práctica es congruente con las expresiones del Tribunal Supremo de Estados Unidos sobre los límites de la cláusula de entera fe y crédito: tratándose de asuntos sobre los cuales un estado o territorio puede legislar, no se puede le compeler a sustituir sus estatutos por los de otra juris-dicción, a menos que los intereses que defiende la otra ju-risdicción sean superiores a los del foro.(26) En esa situa-ción, el peso de probar que, debido al conflicto de leyes, el “estado foro” no debe hacer valer sus propios estatutos en sus propios tribunales recae en la parte que alega que la otra jurisdicción tiene valores más importantes que proteger.(27) De no hacerlo, prevalece la ley del foro. En los casos en que ambos estados proveen guías para proteger a los excónyuges y sus intereses económicos de la manera que entienden más justa, los fundamentos que acoge un foro no podrían ir por encima de los del otro. Por eso, en la doctrina de conflicto de leyes, de manera similar a lo que sucede en la de entera fe y crédito, una política apremiante *127 del foro a favor de su ley sustantiva sobre matrimonio se impondría sobre la del otro estado que compite por reconocimiento.(28)
B. Independientemente del método de división selec-cionado, antes de distribuir los bienes que corresponden a cada excónyuge es necesario clasificar los bienes como pri-vativos y gananciales, si se catalogan según la doctrina de community property, o como separados y matrimoniales, si se realiza la distribución equitativa de los estados de common law.
Esta distribución equitativa se lleva a cabo en tres pa-sos: la clasificación, en la cual se determina la masa divisible; la valoración y la división. Para hacer la clasifica-ción, se identifican todos los activos que sean propiedad de cada excónyuge o de ambos, y luego se determina si esos bienes son matrimoniales o separados.(29) Los bienes sepa-rados se le asignan a su dueño o dueña. Para que se decida otorgarle parte de éstos al otro cónyuge, se exige necesidad económica con un estándar difícil de cumplir.(30) La parte interesada en que un bien se considere matrimonial tiene que probar que éste se adquirió, por uno de los cónyuges o por ambos, durante el matrimonio. Entonces, el activo se presumirá matrimonial y quien se oponga a ello deberá probar que es separado.(31) Aunque tener el título legal so-bre una propiedad no garantiza que ésta se le va a adjudi-car finalmente al titular, el bien se clasifica como separado del cónyuge que tenga el título. El otro cónyuge puede de-mostrar que, por las aportaciones que hizo para la compra del bien o por otras razones, éste debe clasificarse como *128 matrimonial y dividirse de forma equitativa. (32) El título legal también es importante cuando terceras personas son dueñas de los bienes junto a los esposos o los han adquirido de ellos, porque se protege su interés económico sobre la propiedad. (33)
En Puerto Rico, como en otras jurisdicciones donde el régimen matrimonial supletorio es la sociedad de bienes gananciales, se presumen gananciales todos los bienes ad-quiridos por cualquiera de los cónyuges, a título oneroso, por sus esfuerzos o por los frutos que produzcan otros bie-nes, desde la celebración del matrimonio hasta su disolución. (34) Este es el régimen que aplica a todas las pa-rejas que se casan en Puerto Rico, a menos que antes del matrimonio establezcan capitulaciones matrimoniales en las que seleccionen otro régimen para regir su propiedad.(35) En cualquiera de las dos instancias, el régi-men seleccionado antes de establecerse el vínculo matrimonial es inmutable: no se puede cambiar mientras dure el matrimonio.(36)
Cuando se disuelve la sociedad de gananciales y nace la comunidad de bienes posdivorcio, los bienes gananciales forman una masa cuyos dueños, en común pro indiviso, son ambos exesposos. Para dividir la comunidad, se hace un inventario de los bienes que pertenecen a los cónyuges y se clasifican como privativos o gananciales. Los privativos permanecerán en manos de su dueño o dueña, mientras que los gananciales se dividirán en partes iguales, a menos que se demuestre que la proporción justa para la distribu-ción de un bien es otra.(37)
*129 III
A. En el proceso de clasificación de los bienes posdivor-cio, los tribunales se encuentran en la encrucijada de cómo catalogar los inmuebles que se encuentran fuera del foro: según la ley local o la del lugar en que ubica el bien. El Artículo 10 del Código Civil de Puerto Rico indica que “[l]os bienes muebles están sujetos a la ley de la nación del pro-pietario; los bienes inmuebles a las leyes del país en que están sitos”.(38) Sin embargo, como veremos, esta disposi-ción no aplica automáticamente a todos los inmuebles, pues se deben sopesar cuestiones de conflicto de leyes y razones de orden público antes de decidir qué ley regirá la controversia relacionada con un inmueble.
En la jurisprudencia puertorriqueña, encontramos va-riadas situaciones en las que se ha aplicado la ley de Puerto Rico por ser la del lugar donde está radicado el inmueble. Por ejemplo, en Babilonia v. Registrador, a una mujer casada en Nueva York pero domiciliada en Puerto Rico, no se le permitió inscribir tres fincas ubicadas en la Isla como bienes privativos, pues se aplicó la presunción de gananciales que dispone la ley de Puerto Rico, donde se encontraban los inmuebles.(39) De igual forma, en Pueblo v. Denis Rivera, se decidió que regía la ley de Puerto Rico para clasificar como ganancial una casa ubicada en Puerto Rico que compró un hombre casado en Nueva York que luego se mudó a la Isla, aunque el régimen matrimonial por regla general en Nueva York no fuera la sociedad de gananciales.(40)
Sin embargo, debemos hacer una distinción importante de esos casos y otros similares respecto al presente. En todos aquéllos, los inmuebles en controversia se encontra- *130 ban en Puerto Rico, por lo que, al decidir que aplicarían la ley del lugar donde el bien estaba sito, se estaba aplicando la ley del foro. No hubiese sido tan sencilla la selección de la ley del sitio si estas personas, con relaciones significati-vas con Puerto Rico, hubiesen tenido controversias relacio-nadas con bienes ubicados fuera de la Isla y que involucra-ran choques con otras disposiciones de orden público del País.
No se pueden usar esos precedentes para concluir que el Artículo 10 aplica a todo tipo de controversia y que, cuando éste no se ha empleado, el Tribunal ha errado en su razonamiento.(41) Como bien explica la Opinión disidente de la Juez Asociada Rodríguez Rodríguez, cuando se en-mendó este estatuto real en el Código Civil, en 1902, se hizo únicamente para eliminar la norma de que las suce-siones se regirían por el estatuto personal y no para esta-blecer que toda controversia relacionada con inmuebles se atendería según la ley de donde éstos se encontraran. (42) El caso Bracons v. Registrador, resuelto pocos años después, explica esta supresión al hablar de la “reforma importante” que se le hizo al Código Civil y utiliza la palabra “total-mente” para expresar que el estatuto real regiría desde entonces no solo a los derechos sobre bienes inmuebles en casos de contratos, sino también en casos de sucesiones.(43)
Asimismo, no es posible basarse en un comentario que se hizo cuando se enmendó el Código Civil en 1902 para colegir que la norma vigente en Estados Unidos, y que debe aplicar en Puerto Rico, es la de la ley del sitio. La realidad actual dista mucho de esa aseveración. En Esta-dos Unidos, la regla general tradicional de que los inmue-bles se rigen por las normas del lugar en que están locali-zados ha sido descartada para casos de división de bienes *131 posdivorcio en la mayor parte de los estados.(44) La norma del situs se ha dejado de utilizar por ser insuficiente para una solución adecuada de las controversias. Desde hace varias décadas, se ha estado empleando la norma de la fuente de origen, mediante la cual el interés matrimonial sobre un inmueble no cambia porque haya sido adquirido por un solo cónyuge como propiedad separada en un common law state, si se demuestra que el dinero que se utilizó para comprar la propiedad le pertenecía a la pareja o era un bien ganancial en el community property state donde el matrimonio estaba domiciliado anteriormente.(45) Más re-cientemente, se está aplicando la ley del foro que atiende el caso y la referencia al situs del inmueble, solo se utiliza para saber si el tribunal, luego de realizar la división, puede ordenar la transferencia automática del título sobre el bien al cónyuge al que se le asignó o debe ordenarle a la parte que haga los trámites en el registro de propiedades de la otra jurisdicción.(46)
B. Cuando se resolvió Toppel v. Toppel, en 1983, la “nueva realidad puertorriqueña” no era la que la Opinión mayoritaria identifica, a raíz de las discusiones legislati-vas de 1902 sobre la aplicación del estatuto real a todo tipo de controversia referente a inmuebles, sino la que la Cons-titución de Puerto Rico estableció en 1952 y que diversas leyes aprobadas entre 1975 y 1976 reforzaron: la igualdad de derechos entre los hombres y las mujeres.(47) Por eso es sumamente preocupante la revocación parcial innecesaria de Toppel que, sin mayor análisis, propone la decisión *132 mayoritaria.(48) En Toppel, se interpretaron las normas de conflicto de leyes de modo que no violaran la política pú-blica puertorriqueña de equiparar los derechos de la es-posa a los del marido. Se utilizaron las teorías más inno-vadoras en ese momento para proveer guías para la resolución de casos futuros de choques entre jurisdicciones por controversias sobre bienes matrimoniales y se dejó la puerta abierta para estudiar cada caso según las circuns-tancias particulares que presentara, teniendo siempre como máxima la sólida política pública de nuestro foro de igualdad entre los géneros. Si Toppel v. Toppel se hubiese resuelto aplicando rígidamente las normas de conflicto de leyes que establece el Código Civil y otras leyes que los foros inferiores entendían que aplicaban en aquel mo-mento, la señora Toppel hubiese recibido una minúscula parte del patrimonio que forjó junto a su esposo durante los años en que manejaron un negocio exitoso en Puerto Rico. Esa solución hubiese estado muy lejos de los princi-pios que orientaban a los tribunales de Puerto Rico y de muchos otros países en aquella época.
Además, distinto a lo que señala la Opinión mayorita-ria, seis años después de la resolución de Toppel v. Toppel, en Zarelli v. Registrador, este Tribunal no “obvió” el razo-namiento de Toppel para restablecer la vigencia del esta-tuto real en casos de inmuebles gananciales, sino que se distinguió el precedente.(49) Ese caso claramente señala que el Tribunal no utilizó Toppel, porque no se trataba de una liquidación de bienes gananciales y las partes no esta-ban cuestionando la aplicación de las leyes de Puerto Rico.(50) En este caso también es necesario distinguir a Toppel.
En Toppel v. Toppel, las partes no eran puertorriqueños casados en Puerto Rico bajo el régimen de Sociedad de Bie- *133 nes Gananciales, sino una mujer británica y un hombre estadounidense que se casaron en Nueva York, donde no rige el precepto matrimonial de gananciales. Su relación con Puerto Rico para efectos de la división de bienes ga-nanciales se debía a que habían residido y construido su fortuna en la Isla durante trece años y se habían divor-ciado en este país. Como explica el Prof. Raúl Serrano Ge-yls, Toppel continúa vigente para situaciones como las de ese caso: dos extranjeros casados en el extranjero que tie-nen bienes en Puerto Rico y se divorcian aquí. Según se-ñala, ello se debe a que nuestras leyes no pueden alcanzar bienes de personas extranjeras ubicados fuera de nuestros límites territoriales.(51) Los hechos del caso ante nuestra consideración son muy diferentes, pues se trata de dos puertorriqueños que se casaron en Puerto Rico bajo el ré-gimen de sociedad ganancial y tienen bienes tanto en la Isla como en el extranjero.
Por todo lo anterior, no se justifica reducir la fuerza vin-culante de Toppel v. Toppel, un precedente importante para la interpretación de nuestra política constitucional de igualdad entre los géneros.(52) En Toppel se dividieron los inmuebles del matrimonio sitos en Puerto Rico según las leyes de Puerto Rico sobre la Sociedad de Bienes Ganan-ciales, pero no porque aplicara el estatuto real, Artículo 10 de nuestro Código Civil. Tenía que hacerse así porque el estatuto real no se puede aplicar a todo tipo de controver-sias sobre inmuebles sin cometer injusticias en algunos casos.
Por otro lado, tampoco aplica al presente caso el artículo 1277 del Código Civil que la Opinión mayoritaria cita para rechazar las aportaciones de Toppel v. Toppel a nuestra *134 doctrina sobre división de bienes gananciales. Dicho artí-culo dispone la ley que regirá a los matrimonios en los que uno de los miembros de la pareja sea puertorriqueño y el otro sea extranjero y que se casen fuera de Puerto Rico.(53) Además, que el texto de ese artículo se haya enmendado, como consecuencia de lo resuelto en Toppel, para añadir que se atenderán factores como el conflicto móvil y el cen-tro de intereses conyugales, no cambia en nada la norma vigente de que a las parejas puertorriqueñas que hayan contraído matrimonio en Puerto Rico sin otorgar capitula-ciones matrimoniales válidas les aplica el régimen de so-ciedad de gananciales y éste es inmutable. Esa enmienda se realizó para atender una situación de conflicto de leyes relacionada con matrimonios extranjeros y de ninguna ma-nera reduce el alto interés público que tiene el matrimonio en nuestro ordenamiento. (54)
IV
El Artículo 11 del Código Civil de Puerto Rico dispone que los contratos se rigen por las leyes del país en que se otorguen, pero con una excepción: “las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costum-bres, no quedarán sin efecto por leyes o sentencias dictadas ni por disposiciones o convenciones acordadas en países extranjeros. ”(55) Por lo tanto, la vigencia de los contratos realizados en el extranjero que se quieran hacer valer en Puerto Rico queda supeditada a la política pública y las leyes de este país.
*135 En Colón v. Registrador advertimos que el tercer pá-rrafo del Artículo 11 impide que se lleven a cabo negocios fuera de Puerto Rico con el fin de burlar las leyes prohibi-tivas de la Isla sobre asuntos que afecten relaciones o bie-nes en Puerto Rico.(56) En ese caso, nos negamos a darle validez a un testamento mancomunado, realizado por un matrimonio en un país donde está permitido testar de esa manera, mediante el cual se le transfería a la esposa una finca perteneciente a la Sociedad de Bienes Gananciales constituida por ambos y ubicada en Puerto Rico. Explica-mos que los testamentos mancomunados no están permiti-dos en Puerto Rico, por lo que no podíamos avalar que se hiciera uno en otro país para afectar inmuebles matrimo-niales en la isla. Asimismo, al resolver un conflicto entre las leyes de Puerto Rico y las de Venezuela relacionado con el reconocimiento de un hijo, en Martínez v. Vda. de Martínez explicamos que, si la ley extranjera aplicable a la con-troversia contradijera una disposición de orden público de Puerto Rico, se le daría preeminencia al Derecho puertorri-queño porque el Artículo 11 impide que los tribunales de Puerto Rico pongan en vigor leyes, sentencias o acuerdos de países extranjeros que violen las políticas y buenas cos-tumbres de nuestro país.(57)
De manera similar, en casos de conflicto de leyes inter-estatales en los que se ha invocado la cláusula de entera fe y crédito, el Tribunal Supremo de Estados Unidos ha indi-cado que un estado o territorio no tiene que subordinar sus leyes sobre contratos a las del estado en el que se realizó el *136 contrato. Al contrario, si el foro tiene un interés legítimo en aplicar sus propias leyes a la controversia, puede utilizar su normativa sobre contratos para evaluar el contrato que se preparó según las leyes del otro estado.(58) Asimismo, ha decidido que los derechos adquiridos mediante un contrato realizado en un estado distinto al foro se pueden hacer valer en éste siempre y cuando no violen la política pública del foro.(59) Por eso, cuando se presentan contratos cuyo fin es modificar el régimen matrimonial, realizados por los cónyuges en jurisdicciones donde ese pacto es permitido, los tribunales de estados cuyas leyes admiten esos contra-tos los han reputado válidos, pero los de estados cuyas le-yes los prohíben han rechazado hacerlos valer.(60)
Aunque en nuestro derecho de contratos se le da gran peso a la voluntad de las partes, nuestro ordenamiento tam-bién establece instancias en las que no es posible ejecutar lo que éstas han convenido porque ello va en contra de las leyes, la moral o el orden público del País.(61) El ordena-miento jurídico puertorriqueño mantiene varias restriccio-nes a los negocios jurídicos que pueden celebrar los cónyuges. Estas tienen su base en la inmutabilidad del ré-gimen matrimonial y en la política pública de protección al cónyuge más débil de presiones del más fuerte para contro-lar el patrimonio económico.(62) Nuestro ordenamiento con-sidera de alto interés público estas y otras disposiciones re-lativas al matrimonio.(63)
El Artículo 1347 de nuestro Código Civil prohíbe las compraventas entre cónyuges que no hayan pactado pre- *137 viamente la separación de bienes en capitulaciones matrimoniales.(64) Asimismo, el Artículo 1286 veda toda do-nación entre los cónyuges durante el matrimonio, sin im-portar el régimen imperante entre ellos. Sólo se permiten regalos módicos, según el estatus económico de la familia, en ocasiones de regocijo familiar. Todas las demás donacio-nes son nulas, o sea, nunca sucedieron.(65) El contrato que se celebró en Florida en el presente caso es nulo, porque los cónyuges no podían hacerse donaciones entre sí durante el matrimonio. Aun si se considerara que fue un contrato de compraventa, a pesar de que parece ser una donación si-mulada porque intercambiaron un inmueble por diez dóla-res, tampoco sería válido, pues están prohibidas las com-praventas entre los miembros de la sociedad legal de gananciales, que es el régimen que gobierna a los cónyuges en este caso.
Más aun, si analizamos el contrato según las doctrinas de los common law states, nos encontramos con que la cla-sificación de un bien puede cambiar de matrimonial a se-parado por una acción voluntaria de las partes durante el matrimonio, pero un cambio de título mediante contrato de por sí no cambia la clasificación si otras razones apuntan hacia mantener la categoría original, ya que dejar la clasi-ficación al arbitrio de los cónyuges puede prestarse a abusos.(66) Si mediante el acuerdo un cónyuge transfiere sus derechos sobre el bien al otro cónyuge, se analiza si hubo intención de donar.(67) Aquí, el señor Roselló Puig ha señalado, y la señora Rodríguez Cruz no ha negado, que el propósito no era cambiar la clasificación del bien de ganan- *138 cial a privativo, sino evitar que sus acreedores cobraran sus deudas contra la propiedad conyugal. Otro hecho que se toma en consideración en los common law states es si el cónyuge que hace la transferencia de la propiedad termina toda relación con ésta.(68) En este caso sucedió lo contrario y el señor Roselló Puig continuó aportando al pago de la hipoteca hasta que la señora Rodríguez Cruz vendió el inmueble. Aunque el análisis según las normas de distri-bución equitativa sería más extenso, estos son indicios de que el traspaso podría quedar igualmente sin efecto si se hiciera la división posdivorcio fuera de Puerto Rico.
V
El señor Roselló Puig y la señora Rodríguez Cruz se casaron en Puerto Rico sin hacer capitulaciones matrimo-niales, conscientes de que el régimen de Sociedad de Bie-nes Gananciales gobernaría sus relaciones patrimoniales durante todo el matrimonio, ya que el régimen matrimonial seleccionado es inmutable.(69) Según alegan las partes, durante los veinticinco años que estuvieron casados, vivie-ron aproximadamente diez años en Puerto Rico y alrededor de quince años en Florida. Las alegaciones de ambas par-tes reflejan que, mientras residieron en Florida, mantuvie-ron su vínculo con Puerto Rico y adquirieron bienes en este país. De las distintas propiedades inmuebles que compra-ron las partes durante su matrimonio, la única ubicada fuera de Puerto Rico fue la casa de Florida que es eje de esta controversia. Los esposos sabían que la propiedad ubi- *139 cada en Florida era ganancial cuando hicieron el contrato para intentar transferirla a título privativo de la señora Rodríguez Cruz. Cuando la pareja se separó, previo al divorcio, ambos cónyuges se mudaron a Puerto Rico. Asi-mismo, se divorciaron en Puerto Rico.
Ante estos hechos, no resulta arbitrario que los tribuna-les de Puerto Rico a los que las partes acudieron decidan aplicar las leyes de Puerto Rico a las controversias relacio-nadas con la división de bienes posdivorcio, proceso que se está llevando a cabo en Puerto Rico. Así hacerlo constituye aplicar la ley del foro a una situación con la cual el foro tiene una relación significativa, siguiendo la tendencia actual de selección de ley aplica ble para casos de división de bienes posdivorcio. Además, permite que todos los bienes y las controversias sobre la división se atiendan bajo una sola ley, como recomienda la norma de unicidad patrimonial avalada en gran parte de los estados de Estados Uni-dos y en otros países. Asimismo, conlleva que Puerto Rico, como foro en el que se está atendiendo la controversia, ponga en vigor su política pública y salvaguarde los inte-reses sobre las relaciones matrimoniales que defiende, en lugar de colocar por encima de éstos los intereses propie-tarios protegidos por las leyes de Florida.
Como vimos, la regla de utilizar la ley del sitio donde un inmueble está ubicado para regir todas las controversias relacionadas con ese bien ha sido descartada para casos de división de bienes posdivorcio. Aún si continuara vigente, el Artículo 10 del Código Civil, que señala que los inmue-bles están sujetos a las leyes del país en el que están loca-lizados, no aplica en toda ocasión, pues el Artículo 11 fun-ciona como norma de excepción para éste. En este caso, el inmueble se encuentra en Florida, pero el contrato reali-zado de acuerdo con las normas de esa jurisdicción no puede ser ejecutado en Puerto Rico, pues contraviene una ley prohibitiva concerniente a las personas y sus bienes, que es, a la vez, una disposición de orden público. El *140 ordenamiento puertorriqueño prohíbe los contratos de compraventa y las donaciones entre cónyuges casados bajo el régimen de Sociedad de Bienes Gananciales. Como dis-pone el Artículo 11, estas prohibiciones no quedan sin efecto por el hecho de que el inmueble en controversia esté ubicado en Florida o porque el contrato relacionado con el inmueble se haya otorgado en ese estado y sea válido allá.
Entiendo, como el Tribunal de Apelaciones, que el con-trato entre los cónyuges no cambió la naturaleza ganancial del inmueble sito en Florida, pues los bienes adquiridos por el señor Roselló Puig y la señora Rodríguez Cruz per-tenecían a la Sociedad de Bienes Gananciales que ellos componían al momento del contrato. Dado que el régimen matrimonial seleccionado por ellos en Puerto Rico era in-mutable, no podían hacer una excepción para que el esposo le traspasara a la esposa ese bien. La Sociedad de Bienes Gananciales, con los derechos y las prohibiciones que ésta acarrea, siguió siendo la misma mientras los cónyuges vi-vieron en Florida y ésta estuvo regida en todo momento por las leyes de Puerto Rico.
La cláusula constitucional de entera fe y crédito no re-quiere el resultado escogido por la mayoría. No podemos erigir una barrera para la administración de las leyes de Puerto Rico que la Constitución de Estados Unidos no im-pone, y mucho menos cuando el efecto de esa traba es ig-norar el ordenamiento jurídico vigente en el País sobre un aspecto de sumo interés público.

 Por no haber controversia en cuanto a los hechos reseñados en la Opinión mayoritaria, no los expondremos nuevamente.

 Art. IV, Sec. 1, Const. E.E. U.U., L.P.R.A., Tomo 1, ed. 2008, pág. 177.

 R.H. Jackson, Full Faith and Credit: The Lawyer’s Clause of the Constitution, Nueva York, Columbia U. Press, 1945, págs. 10-28. El Tribunal Supremo de Puerto Rico también ha explicado que la cláusula de full faith and credit no opera ex proprio vigore y está sujeta a excepciones, por lo que, en el contexto de las sentencias judiciales, no se le puede dar entera fe y crédito a una sentencia de otro estado, haciendo caso omiso de las leyes puertorriqueñas que exigen la intervención previa de un tribunal local. Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 420 (1985); Rose-berry v. Registrador, 114 D.P.R. 743, 747 (1983).

 CO W.J. Rich, Modern Constitutional Law, 3ra ed., Minnesota, Ed. West, 2011, Vol. 3, pág. 139.

 (Traducción nuestra.) Pink v. A.A.A. Highway Exp., 314 U.S. 201, 210 (1941). La versión original en inglés expresa: “[T]he very nature of the federal union of states, to each of which is reserved the sovereign right to make its own laws, precludes resort to the Constitution as the means for compelling one state wholly to subordinate its own laws and policy concerning its peculiarly domestic affairs to the laws and policy of others.”

 Hughes v. Fetter, 341 U.S. 609, 611-612 (1951).

 Rich, op. cit., pág. 140.

 Véase Philips Petroleum. Co. v. Shutts, 472 U.S. 797, 821-822 (1985).

 A.T. Von Mehren y D.T. Trautman, The Law of Multistate Problems: Cases and Materials on Conflict of Laws, Boston, Ed. Little, Brown and Co., 1965, págs. 1243-1244. Inicialmente, esta cláusula estaba pensada para que las sentencias de las cortes de los estados, y las deudas contributivas en virtud de Jas leyes sobre impuestos estatales, se pudieran hacer valer en otras jurisdicciones. íd., págs. 1229-1230. Estos autores también señalan que pensar en una uniformidad jurídica, espe-cialmente en temas “domésticos”, dentro de un sistema federalista es imposible, pues cada estado tiene la libertad de establecer su propia política pública. íd., pág. 1299.

 íd., pág. 1242; Rich, op. cit., pág. 143.

 Armstrong v. Armstrong, 85 D.P.R. 404, 409 (1962).

 “[Cjhoice of law problems are not any easier to solve if they arise in a federal union”. K.H. Nadelmann, Conflict of Laws: International and Interstate, The Hague, Ed. Martinus Nijhoff, 1972, pág. 213.

 Véase Opinión mayoritaria, págs. 110-112.

 Rich, op. cit., págs. 140-141.

 Véase Opinión mayoritaria, pág. 116

 Véase J.M. de Lasala Samper, El régimen matrimonial de bienes. Derecho internacional privado e interregional, Barcelona, Ed. Bosch, 1954, págs. 19-24. Véanse, también: L. Plsson, Marriage and Divorce in Comparative Conflict of Laws, Leiden, Ed. A.W. Sijthoff, 1974; A. Miaja de la Muela, Derecho Internacional Privado, 9na ed., Madrid, Ed. Atlas, 1982, T. 2, págs. 357-376.

 E.F. Scoles y P. Hay, Conflict of Laws, 2da ed., Minnesota, Ed. West, 1992, pág. 433.

 Id., pág. 469. Véase, también, R.A. Leñar, American Conflicts Law, 3ra ed., Indianapolis, Ed. Bobbs-Merrill, 1977, pág. 471.

 B.R. Turner, Equitable Distribution of Property, 3ra ed., Minnesota, Ed. Thomson West, 2005, Vol. 1, págs. 161-162.

 Hablamos de la mayor incompatibilidad, pues, dado que ni siquiera hay uniformidad en las leyes de los estados que están en una misma categoría (common law o community property states). Siempre surgen conflictos de leyes. Sin embargo, si ambos estados utilizan sistemas similares de división, se pueden armonizar los es-tatutos con mayor facilidad.

 Turner, op. cit., Vol. 1, págs. 2-3.

 Sobre los bienes privativos en Puerto Rico, véase: Art. 1299 del Código Civil, 31 L.P.R.A. sec. 3631.

 Scoles, op. cit., págs. 487-489; H. Marsh, Marital Property in Conflict of Laws, Seattle, University of Washington Press, 1952, págs. 234-235 y 247.

 Marsh, op. cit., pág. 100.

 Turner, op. cit, Vol. 1, págs. 158-161. Por ejemplo, en Louisiana, se enmen-daron las disposiciones del Código Civil que atienden los conflictos de leyes en casos de división de bienes entre los cónyuges, para establecer que los inmuebles en Louisiana adquiridos por los esposos se rigen por las leyes de Louisiana, mientras que los inmuebles ubicados fuera de ese estado y adquiridos por alguno de los esposos du-rante el matrimonio, si mantenía domicilio en Louisiana, también se rigen por las leyes de Louisiana a los fines de determinar el derecho de cada cónyuge al valor del inmueble al disolverse la comunidad posdivorcio. La.Civil Code Arts. 3524-3525.

 Franchise Tax Bd. of Cal. v. Hyatt et al., 538 U.S. 488, 494-497 (2003); Pacific Employers Ins. Co. v. Industrial Accident Comm’n, 306 U.S. 493, 501-503 (1939).

 Rich, op. cit., pág. 141.

 Marsh, op. cit., págs. 114-117.

 Turner, op. cit., Vol. 1, págs. 158 y 251-253. A pesar de que la distribución no se centra en el título sobre las cosas, es importante la clasificación para determinar qué bienes formarán parte de la masa matrimonial que se dividirá.

 íd., Vol. 2, págs. 940-944.

 íd., Vol. 1, págs. 255-256.

 íd., págs. 264-265.

 íd., pág. 164.

 Arts. 1301 y 1307 del Código Civil, 31 L.P.R.A. secs. 3641 y 3647.

 Maldonado v. Cruz, 161 D.P.R. 1, 15-19 (2004).

 Art. 1272 del Código Civil, 31 L.P.R.A. sec. 3556.

 Montalván v. Rodríguez, 161 D.P.R. 411 (2004).

 31 L.P.R.A. sec. 10.

 Babilonia v. Registrador, 62 D.P.R. 688 (1943).

 Pueblo v. Denis Rivera, 98 D.P.R. 704 (1970).

 Véase Opinión mayoritaria, págs. 102-104.

 Véase Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 154-155.

 Bracons v. Registrador de San Juan, 24 D.RR. 753, 757 (1917). Véase Opi-nión mayoritaria, pág. 103.

 Turner, op. cit., Vol. 1, pág. 158; Scoles, op. cit., pág. 469.

 Scoles, op. cit., págs. 472-473; Marsh, op. cit., pág. 102. El Restatement of the Law incluye esta regla como límite a la aplicación de la ley del situs en el primer comentario a la disposición sobre los efectos del matrimonio en el interés sobre tie-rras adquiridas luego del casamiento. 2 Restatement of the Law (Conflicts of Laws) 2d Sec. 234, pág. 37 (1971).

 Turner, op. cit., Vol. 1, pág. 160, y Vol. 3, págs. 21-22.

 Toppel v. Toppel, 114 D.P.R. 775, 793-795 (1983). Este caso se resolvió en equidad, pues las leyes existentes eran insuficientes para una solución razonable. Art. 7 del Código Civil, 31 L.P.R.A. sec. 7.

 Véase Opinión mayoritaria, págs. 102-103.

 Véase Opinión mayoritaria, pág. 104.

 Zarelli v. Registrador, 124 D.P.R. 543, 550 esc. 4 (1989).

 R. Serrano Geyls, Derecha de familia de Puerto Rico y legislación compa-rada, San Juan, Ed. Programa de Educación Jurídica Continua U.I.P.R., 1997, Vol. 1, pág. 510.

 Véanse: J.J. Alvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 868; I. Ramos Buonomo, Derecho de Familia, 75 (Núm. 3) Rev. Jur. U.P.R. 293, 316 (2006).

 31 L.P.R.A. sec. 3561.

 Véase Opinión mayoritaria, págs. 106-115.

 31 L.P.R.A. sec. 11. Esta excepción, que se encuentra en el tercer párrafo de ese artículo, también aplica al Artículo 10 del Código Civil (el estatuto real). El párrafo citado comienza con la frase: “No obstante lo dispuesto en esta sección y en la anterior”.

 Colón v. Registrador, 67 D.P.R. 17, 23 (1947). Véanse también las discusio-nes sobre la importancia del lugar donde el contrato va a tener efecto tanto en la Opinión mayoritaria como en la disidente de Vda. de Ruiz v. Registrador, 93 D.P.R. 914 (1967).

67) Martínez v. Vda. de Martínez, 88 D.P.R. 443, 454-455 (1963). Véase también la Opinión concurrente del entonces Juez Asociado Señor Hernández Denton en el caso López v. González, 151 D.P.R. 225 (2000) (Sentencia), en la que se explica que, debido al alto interés público que tienen las capitulaciones matrimoniales, no se pueden hacer valer en Puerto Rico unas capitulaciones que incumplan con los requisitos de las leyes puertorriqueñas, aunque se hayan realizado conforme a las leyes del lugar donde se otorgaron.

 Watson v. Employers Liab. Assur. Corp., Ltd., 348 U.S. 66, 73 (1954).

 Griffin v. McCoach, 313 U.S. 498, 506-507 (1941).

 Scoles y Hay, op. cit., pág. 490.

 Véanse, como ejemplos, las disposiciones del Código Civil de Puerto Rico sobre la voluntad de las partes en la contratación, Arts. 1206-1207, 1210,1213-1220 y 1233 a 1235, y sobre las restricciones a los pactos que pueden realizar las partes contratantes, Arts. 1208, 1210 y 1223 (31 L.P.R.A. secs. 3371-3372, 3375, 3391, 3401-3407, 3421 y 3471-3473).

 Serrano Geyls, op. cit., pág. 317.

 Véanse: López v. González, supra, págs. 252-253; Ortiz Ortiz v. Sáez Ortiz, 90 D.P.R. 837, 838 (1964).

 31 L.P.R.A. sec. 3772.

 31 L.P.R.A. sec. 3588. Tampoco está permitida la cesión de la participación en los bienes gananciales de un cónyuge a otro, sino hasta luego de disuelto el vín-culo matrimonial. Art. 1316 del Código Civil, 3Í L.P.R.A. sec. 3691.

 Turner, op. cit., Vol. 1, págs. 69-70 y 652-680. En Puerto Rico también la inscripción a título privativo no es definitiva, pues se puede presentar prueba de que el bien es ganancial. Méndez v. Ruiz Rivera, 124 D.P.R. 579 (1989).

 Turner, op. cit., Vol. 1, págs. 661-679.

 íd., Vol. 1, pág. 659.

 Durante el proceso de revisión del Código Civil de Puerto Rico que se llevó a cabo en la década pasada, se propuso abolir la inmutabilidad del régimen matrimonial, pero esas recomendaciones aún están pendientes de discusión. Véanse: Z. Cruz Torres, Reforma del derecho internacional privado puertorriqueño en el matrimonio y su régimen económico, 43 (Núm. D Rev. Jur. U.I.P.R. 151 (2008); M. Fraticelli Torres, Un nuevo acercamiento a los regímenes económicos en el matrimonio: la sociedad legal de gananciales en el derecho puertorriqueño, 39 (Núm. 1) Rev. Jur. U.I.P.R. 113 (2004).